**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| DELIA DE SANTIAGO LIZAMA, MICHELLE OLSEN, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>VENUS LABORATORIES, INC., dba EARTH FRIENDLY PRODUCTS, INC.<br>Serve:  Registered Agent<br>   Venus Laboratories, Inc.,<br>   dba Earth Friendly Products, Inc.<br>   11150 Hope St.<br>   Cypress, CA 90630<br><br>    Defendant. | )<br>)<br>)<br>)<br>) Cause No.<br>)<br>) Division:<br>)<br>)<br>)<br>) JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CLASS ACTION COMPLAINT**

COME NOW Plaintiffs Delia De Santiago Lizama and Michelle Olsen, on behalf of themselves and all others similarly situated, through their attorneys, and brings this action against Defendant Venus Laboratories, Inc. dba Earth Friendly Products, Inc. (hereinafter referred to as "Defendant," "Earth Friendly," or "ECOS"); and, upon information and belief, except as to the allegations that pertain to themselves, which are based upon personal knowledge, alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiffs bring this action on their own behalf and as a representative of a class of persons similarly situated who purchased Earth Friendly's ECOS brand Products for personal, family, or household purposes.

2. In recent years, consumers have become significantly more aware of and sensitive to the toxicity and impact of household products on the environment.  Consumers seek, and will

pay a premium for, products that are safe and responsibly made, including products that will not negatively affect the environment.

3.      As a result, demand has increased for "green" products that are non-toxic, safe, and environmentally friendly.

4.      Earth Friendly develops, manufacturers, markets, distributes, and sells a variety of personal, family, or household products under its ECOS brand, including:

- ECOS® All-Purpose Cleaner - Parsley Plus®
- ECOS® All-Purpose Cleaner - Orange Plus®
- ECOS® Cream Cleanser - Lemon
- ECOS® Fruit + Veggie Wash
- ECOS® Furniture Polish + Cleaner - Orange
- ECOS® Shower Cleaner - Tea Tree
- ECOS® Stain + Odor Remover - Lemon
- ECOS® Stainless Steel Cleaner + Polish
- ECOS® Toilet Cleaner - Cedar
- ECOS® Window Cleaner - Vinegar
- ECOS® Between Baths™ Grooming Spray - Peppermint
- ECOS® Kitty Litter Deodorizer
- ECOS® Hypoallergenic Laundry Detergent with Enzymes - Magnolia & Lily
- ECOS® Liquidless Laundry Detergent Squares - Lavender Vanilla
- ECOS® Liquidless Laundry Detergent Squares - Free & Clear
- ECOS® Liquidless Laundry Detergent Squares - Magnolia & Lily
- ECOS® Hypoallergenic Laundry Detergent Pack - Free & Clear
- ECOS® Hypoallergenic Hand Soap - Free & Clear
- ECOS® Hypoallergenic Pet Shampoo - Peppermint
- ECOS® Hypoallergenic Pet Shampoo – Fragrance Free
- ECOS® Pet Stain & Odor Remover
- ECOS® Hypoallergenic Dish Soap - Lavender
- ECOS® Hypoallergenic Dish Soap - Bamboo Lemon
- ECOS® Hypoallergenic Dish Soap - Grapefruit
- ECOS® Hypoallergenic Dish Soap - Apricot
- ECOS® Hypoallergenic Dish Soap - Pear
- ECOS® Hypoallergenic Dishmate Dish Soap – Free & Clear
- ECOS® Hypoallergenic Dishmate Dish Soap – Grapefruit
- ECOS® Hypoallergenic Dishmate Dish Soap – Almond
- ECOS® Wave® Dishwasher Gel - Free & Clear
- ECOS®  Wave® Dishwasher Packs - Free & Clear
- ECOS® WaveJet® Rinse Aid

2

- ECOS® Hypoallergenic Hand Soap - Lavender
- ECOS® Hypoallergenic Hand Soap - Lemongrass
- ECOS® Hypoallergenic Hand Soap – Orange Blossom
- ECOS® Hypoallergenic Laundry Detergent - Lavender
- ECOSNEXT™ Hypoallergenic Liquidless Laundry Detergent - Magnolia & Lily
- ECOSNEXT™ Hypoallergenic Liquidless Laundry Detergent – Lavender Vanilla
- ECOSNEXT™ Hypoallergenic Liquidless Laundry Detergent – Free & Clear
- ECOS® Hypoallergenic Laundry Detergent with Enzymes - Free & Clear
- ECOS® Hypoallergenic Laundry Detergent with Enzymes - Lavender
- ECOSBreeze® Odor Eliminator - Magnolia & Lily
- ECOSBreeze® Odor Eliminator - Lemongrass
- ECOSBreeze® Odor Eliminator – Lavender Vanilla
- ECOS® Hypoallergenic Dish Soap - Free & Clear
- ECOS® Hypoallergenic Laundry Detergent - Magnolia & Lily
- ECOS® Hypoallergenic Laundry Detergent - Lemongrass
- ECOS® Hypoallergenic Baby Laundry Detergent - Free & Clear
- ECOS® Hypoallergenic Baby Laundry Detergent - Lavender Chamomile
- ECOS® Baby Bottle & Dish Wash - Free & Clear
- ECOS®  Baby Stain & Odor Remover
- ECOS® Baby Toy & Table Cleaner - Free & Clear

(hereinafter the "ECOS Products" or the "Products").[1]

5.      This action seeks to remedy the unlawful, unfair, deceptive, and misleading business practices of Earth Friendly with respect to the marketing and sale of its household cleaning products, which are sold throughout the State of Missouri, the State of California, and the United States.

6.      In an effort to increase profits and to gain an advantage over its lawfully acting competitors, Earth Friendly falsely and misleadingly markets and labels the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."  Contrary to these representations, the Products are plainly ***not*** "non-toxic," "safer," and environmentally friendly

---

[1] Plaintiffs reserve the right to amend this Complaint to include any additional household cleaning items sold by ECOS that are within the scope of this Complaint.

because the Products can cause harm to humans, animals, and/or the environment.  This marketing and labeling deceives consumers into believing that they are receiving non-toxic, safe, and environmentally friendly Products, but Earth Friendly's Products do not live up to these claims.

7.      Conscious of consumers' increased interest in more "green" products that are non-toxic, safe, and environmentally-friendly and willingness to pay more for products perceived to meet this preference, Earth Friendly misleadingly, illegally, and deceptively seeks to capitalize on these consumer "green" trends.

8.      Plaintiffs purchased the Products in reliance on Earth Friendly's representations that these Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable." They would not have purchased the Products if they had known that they were toxic, harmful, dangerous, and environmentally damaging.

9.      Consumers expect products that are marketed as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" to not contain toxic, harmful, dangerous, and environmentally damaging ingredients such as phenoxyethanol, methylisothiazolinone, cocamidopropyl betaine, and lauramine oxide.

10.     ***Phenoxyethanol*** is one of the ingredients used in numerous ECOS Products. Phenoxyethanol is toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.  Even short exposure could cause serious temporary or residual injury.  It is toxic to the kidneys, the nervous system, and the liver.  It is extremely hazardous in case of eye contact and very hazardous in case of skin contact (defatting

4

the skin and adversely affecting the central nervous system and peripheral nervous system, causing headaches, tremors, and central nervous system depression).  It is also very hazardous in case of ingestion or inhalation.  It degrades into substances that are even more toxic.  It is a Category 2 germ cell mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure.  Phenoxyethanol is an ethylene glycol ether, which is known to cause wasting of the testicles, reproductive changes, infertility, and changes to kidney function.  Phenoxyethanol is also Category 2 carcinogen, meaning that it is suspected to induce cancer or increase its incidence.

11.     Case studies indicate that repeated exposure to phenoxyethanol results in acute neurotoxic effects, as well as chronic solvent-induced brain syndrome, constant irritability, impaired memory, depression, alcohol intolerance, episodes of tachycardia and dyspnea, and problems with balance and rash.

12.     Plaintiffs and the Class reasonably believed Earth Friendly's false and misleading representations.  Earth Friendly knew or reasonably should have known that its representations regarding the Products were false, deceptive, misleading, and unlawful under Missouri law, California law, and common law.

13.     Earth Friendly misrepresented, and/or concealed, suppressed, or omitted material facts in connection with the sale, distribution, and/or advertisement of the Products.

14.     Plaintiffs and the Class Members paid a premium for the Products over comparable products that did not purport to be "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."  Given that Plaintiffs and Class Members paid a premium for the Products based on Earth Friendly's representations that they are non-toxic, safe, and

environmentally friendly, Plaintiffs and the Class Members suffered an injury in the amount of the purchase price and/or the premium paid.

15.     Plaintiffs brings claims against Earth Friendly individually and on behalf of the Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period") for (1) violation of the Missouri Merchandising Practices Act ("MMPA"), § 407.010 *et. seq.*; (2) violation of California's Consumer Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq.*; (3) violation of California's False Advertising Law ("FAL"), Business & Professions Code § 17500 *et seq.*; (4) violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, *et seq.*; (5) breach of express warranty; (6) breach of implied warranty of merchantability; (7) unjust enrichment; (8) negligent misrepresentation; and (9) fraud.

## PARTIES

16.     At all relevant times, Plaintiff Delia De Santiago Lizama was and is a resident of the State of Missouri.  During the Class Period, Plaintiff Lizama has purchased ECOS Products for personal, family, or household use from a Whole Foods Market in St. Louis County.  Plaintiff Lizama's purchases include, without limitation, ECOS® Hypoallergenic Laundry Detergent – Lavender, ECOS® Hypoallergenic Dish Soap - Free & Clear, and ECOS® Hypoallergenic Laundry Detergent - Magnolia & Lily in the state of Missouri.  Accordingly, Plaintiff Lizama has been injured as a result of Defendant's unlawful conduct alleged herein.

17.     Plaintiff Lizama purchased the ECOS Products because she saw the labeling, advertising, the Defendants' website, and read the packaging, which represented that the Products were as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."  Plaintiff

6

Lizama relied on Defendant's false, misleading, and deceptive representations that the Products are non-toxic, safe, and environmentally friendly. She understood this to mean that the Products were not non-toxic, safe, and environmentally friendly and would not cause harm to humans, animals, and/or the environment. Plaintiff Lizama would not have purchased the Products at all, or would have been willing to pay a substantially reduced price for the ECOS Products, if she had known that they were toxic, harmful, dangerous, and environmentally damaging. Plaintiff Lizama would purchase the Products in the future if Defendant changed the composition of the Products so that they conformed to their non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" packaging and labeling, or if the packages and labels were corrected and she could trust that they were correct.

18.     At all relevant times, Plaintiff Michelle Olsen was and is a resident of the State of California. During the Class Period, Plaintiff Olsen has purchased ECOS Products for personal, family, or household use from a Whole Foods Market in Pasadena, California. Plaintiff Olsen's purchases include, without limitation, ECOS® Hypoallergenic Laundry Detergent – Free & Clear in the state of California. Accordingly, Plaintiff Olsen has been injured as a result of Defendant's unlawful conduct alleged herein.

19.     Plaintiff Olsen purchased the ECOS Products because she saw the labeling, advertising, the Defendants' website, and read the packaging, which represented that the Products were as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable." Plaintiff Olsen relied on Defendant's false, misleading, and deceptive representations that the Products are non-toxic, safe, and environmentally friendly. She understood this to mean that the Products

7

were not non-toxic, safe, and environmentally friendly and would not cause harm to humans, animals, and/or the environment. Plaintiff Olsen would not have purchased the Products at all, or would have been willing to pay a substantially reduced price for the ECOS Products, if she had known that they were toxic, harmful, dangerous, and environmentally damaging. Plaintiff Olsen would purchase the Products in the future if Defendant changed the composition of the Products so that they conformed to their non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" packaging and labeling, or if the packages and labels were corrected and she could trust that they were correct.

20.     Defendant Earth Friendly is a Delaware corporation with its principal place of business in Addison, Illinois, and corporate headquarters in Cypress, CA. Earth Friendly conducts business, including advertising, distributing, and/or selling the ECOS Products, throughout Missouri, including the County of St. Louis, Missouri, California, and the United States.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed Classes are in excess of $5,000,000, exclusive of interests and costs, and Plaintiffs, as well as most members of the proposed Classes, which total more than 100 class members, are citizens of states different from the state of Defendants.

22.     This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts in Missouri or otherwise intentionally did avail themselves of the

markets within Missouri, through their sale of the Product in Missouri and to Missouri consumers.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because Defendant regularly conduct business throughout this District, and a substantial part of the events and/or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

24.     In recent years, consumers have become increasingly concerned about using household cleaning products that are safe for humans, animals, and the environment.  Consumers have poured billions of dollars into the "eco-friendly" and "green" cleaning-products market.  In fact, this market segment is expected to reach over $40 billion by 2025.

25.     In response to consumers' desire for safe, environmentally friendly, and non-toxic cleaning products, many companies "greenwash" their products by deceptively claiming that their cleaning products are safe.  Unfortunately, rather than creating the safe and non-toxic products that consumers desire, many companies, like Earth Friendly, have chosen instead to "greenwash" their products through deceptive labeling, suggesting and outright stating that their cleaning products are safe, environmentally friendly, and non-toxic when, in fact, they can cause harm to humans, animals and/or the environment.

### The Federal Trade Commission "Green Guides"

26.     Recognizing this problem, the United States Federal Trade Commission ("FTC") created the "Green Guides" to help companies avoid making misleading and deceptive claims.[2] The Green Guides specifically address the use of the term "non-toxic" in the marketing of a product, stating, "A non-toxic claim likely conveys that a product, package, or service is non-

---

[2] *See generally* 16 C.F.R. § 260 – Guides for the Use of Environmental Marketing Claims.

toxic both for humans and for the environment generally."[3]  Accordingly, "[i]t is deceptive to misrepresent, directly or by implication, that a product, package or service is non-toxic.  Non-toxic claims should be clearly and prominently qualified to the extent necessary to avoid deception."[4]

27.     Indeed, in commenting on the Green Guides, the Environmental Protection Agency ("EPA") "**believes that marketers will 'rarely, if ever, be able to adequately qualify and substantiate such a claim of 'non-toxic' in a manner that will be clearly understood by consumers**.'" (emphasis added).[5]

> The EPA further explained: [A] "non-toxic" claim conveys that a product is non-toxic for both humans and for the environment generally.  Demonstrating a lack of toxicity in a generic sense involves testing for a broad array of endpoints (*e.g.*, acute toxicity, carcinogenicity and other chronic effects, developmental and reproductive toxicity, neurotoxicity, sensitization, etc.) across a variety of species. It is highly unlikely that the typical consumer product will have been subjected to this degree of testing with a resulting finding of "no adverse effect" for each of the endpoints evaluated.[6]

28.     "According to the EPA, this inference might prevent consumers from taking necessary precautions in handling a product."[7]

---

[3] 16 C.F.R. § 260.10(b).
[4] 16 C.F.R. § 260.10(a).
[5] EPA Comments on Proposed Revisions to Green Guides (2010) (*available at* https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-marketing-claims-project-no.p954501-00288%C2%A0/00288-57070.pdf).
[6] *Id.* Fed. Trade Comm'n, The Green Guide Statement and Business Purpose (2012) (*available at* https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf) ("Similarly, CU suggested that because 'non-toxic' claims are so difficult to substantiate and for consumers to verify, the marketplace would be better served with 'specific claims of how a product contains less toxic or no toxic materials rather than using a 'non-toxic' claim.'").
[7] *Id.*

29.     The Green Guides also provide examples of marketing claims in order to "provide

the Commission's views on how reasonable consumers likely interpret certain claims."[8]  The

FTC provided the following relevant example:[9]

> A marketer advertises a cleaning product as "essentially non-toxic" and
> "practically non-toxic."  **The advertisement likely conveys that the product
> does not pose any risk to humans or the environment, including household
> pets.**  If the cleaning product poses no risks to humans but is toxic to the
> environment, the claims would be deceptive. (Emphasis added).

30.     This example demonstrates that even when "non-toxic" claims are qualified by

such terms as "essentially" or "practically," they are nonetheless construed by reasonable

consumers as "not pos[ing] any risk to humans or the environment, including household pets."

Thus, broad and unqualified non-toxic claims, such as the ones present on the Products, would

even more strongly convey the meaning that the Products do not pose any risk of harm to

humans, animals, or the environment.

31.     In addressing "General Environmental Benefit Claims," the Green Guides state:

(a) It is deceptive to misrepresent, directly or by implication, that a product,
    package, or service offers a general environmental benefit.

(b) Unqualified general environmental benefit claims are difficult to interpret and
    likely convey a wide range of meanings.  In many cases, such claims likely
    convey that the product, package, or service has specific and far-reaching
    environmental benefits **and may convey that the item or service has no
    negative environmental impact. Because it is highly unlikely that
    marketers can substantiate all reasonable interpretations of these claims,
    marketers should not make unqualified general environmental benefit
    claims.**

(c) Marketers can qualify general environmental benefit claims to prevent
    deception about the nature of the environmental benefit being asserted.  To
    avoid deception, marketers should use clear and prominent qualifying
    language that limits the claim to a specific benefit or benefits.  Marketers
    should not imply that any specific benefit is significant if it is, in fact,
    negligible.  If a qualified general claim conveys that a product is more

---

[8] 16 C.F.R. § 260.1(d).
[9] 16 C.F.R § 260.10.

environmentally beneficial overall because of the particular touted benefit(s), marketers should analyze trade-offs resulting from the benefit(s) to determine if they can substantiate this claim.

(d) Even if a marketer explains, and has substantiation for, the product's specific environmental attributes, this explanation will not adequately qualify a general environmental benefit claim if the advertisement otherwise implies deceptive claims.  Therefore, marketers should ensure that the advertisement's context does not imply deceptive environmental claims.

16 C.F.R. § 260.4 (emphasis added).

### The National Advertising Division of the Better Business Bureau

32.  The National Advertising Division ("NAD") is the investigative unit of the Better Business Bureau.  The NAD is charged with monitoring and evaluating the truth and accuracy of advertisements directed toward consumers.  As relevant here, the NAD recently evaluated a similar cleaning product, Windex, which was labeled as "Non-Toxic."[10]  As a result of its evaluation, on March 24, 2020, the NAD recommended that S.C. Johnson & Son, the company that manufactures and sells Windex, "discontinue the claim 'non-toxic' on the package labeling of its Windex Vinegar Glass Cleaner."[11]

33.  In explaining its decision, the NAD stated:

After considering the guidance offered by the Federal Trade Commission's Guides for the Use of Environmental Marketing Claims ("Green Guides") and FTC precedent, NAD determined that **the term "non-toxic,"** as used on the label of Windex Vinegar Glass Cleaner, **reasonably conveys a message that the product will not harm people (including small children), common pets, or the environment.  Importantly, NAD noted that a reasonable consumer's understanding of the concept of "will not harm" is not limited to death, but also various types of temporary physical illness, such as vomiting, rash, and gastrointestinal upset.**[12]

---

[10] https://bbbprograms.org/programs/all-programs/national-advertising-division/nad-sc-johnson-windex-vinegar-glass-cleaner-claim

[11] *Id.*

[12] *Id.* (emphasis added).

34.     Even though S.C. Johnson & Son had provided the NAD with substantiation for the non-toxic claim, the NAD determined that "the evidence fell short of providing the conclusive assessment of toxicity necessary to support a 'non-toxic' claim."  Thus, the NAD recommended that S.C. Johnson & Son discontinue the claim "non-toxic."[13]

35.     S.C. Johnson & Son appealed the NAD's decision to the National Advertising Review Board ("NARB"), which is the appellate body of the Better Business Bureau's self-regulation program.[14]

36.     However, on August 6, 2020, the NARB agreed with the NAD's decision and recommended that S.C. Johnson & Son discontinue the non-toxic claim on the labeling of its Windex product.[15]  The NARB "express[ed] concern that an unqualified non-toxic claim will lead reasonable consumers to conclude not only that a misused cleaning product does not pose a risk of death or serious consequences, but also that product misuse poses no health risks, even those that are not severe or are more transient in nature."[16]

37.     Because of concerns about safety, consumers have increasingly sought out safe and non-toxic household cleaning products, the sales of which have surged in recent years. Unfortunately, rather than providing consumers with true "non-toxic" and safe products, Earth Friendly has advertised, labeled, and sold products that are not "non-toxic" or safe and that can cause harm to humans, animals, and the environment.

---

[13] *Id.*
[14] https://bbbprograms.org/media-center/newsroom/narb-recommends-s.c.-johnson-discontinue-unqualified-non-toxic-claim-on-windex-vinegar-glass-cleaner
[15] *Id.*
[16] *Id.* (emphasis added).

**Earth Friendly's False and Misleading Representations**

38.     Earth Friendly has misrepresented that the ECOS Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" throughout the Class Period.

39.     Earth Friendly's marketing materials are replete with statements that the Products are non-toxic, safe, and environmentally friendly.

40.     The labeling for the Products claims that they are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."

41.     The Products "non-toxic," "safer," and environmentally-friendly labels are accompanied by the following additional labeling claims regarding the Products:

"Welcome to a safer clean."

"Made Without 1-4 Dioxane"

"Our plant-powered products are non-toxic and safer for you, your home and our planet because we believe clean shouldn't mean spreading toxins all over your home.  It's been our ECOS® promise for over 50 years."

"Each bottle contains over 50 years of scientific passion and plant-powered goodness."

14





### ECOS | WELCOME TO A SAFER CLEAN

Our plant-powered products are non-toxic and safer for you, your home and our planet, because we believe clean shouldn't mean spreading toxins all over your home.

It's been our ECOS® promise for over 50 years.

**SAFER**
Made without known carcinogens, reproductive toxins or endocrine disruptors.

**POWERFUL**
Plant-powered to preserve fabrics, leaving them softer, brightening colors and whitening whites.

**SUSTAINABLE**
Made in carbon neutral, water neutral and zero waste facilities using 100% renewable energy.

### HOW TO USE

A little goes a long way with our ultra-concentrated formula. Suitable for cold and hot water. Follow garment care directions.

**PRETREAT:** Pour directly onto stain. Rub lightly and wash as usual.

**MACHINE WASH:**
1 oz. per HE load and 2 oz. per standard load.

**HEAVY SOILED:** 2 oz. per HE load and 3 oz. per standard load.

**HAND WASH:** Use one teaspoon.

CAP LINE 1 = 1 OZ.
CAP LINE 2 = 2 OZ.

### ONLY 6 INGREDIENTS

1. Water
2. Cocamidopropyl Betaine (plant-derived surfactant)
3. Sodium Coco-Sulfate (plant-derived surfactant)
4. Cocamidopropylamine Oxide (plant derived surfactant)
5. Phenoxyethanol (preservative)
6. Methylisothiazolinone (preservative)

To learn more about what's IN and OUT of our products, please visit us at ecos.com/saferchoice

**Safely store out of children's reach.**

- Contains natural ingredients; color and body may vary. 100% Vegan formula
- Formula is greywater & septic tank safe and readily biodegradable.

NOT TESTED ON ANIMALS

MAJORITY WOMEN OWNED

PLASTIC BOTTLE

Family owned and operated in CA, IL, NJ and WA.
Earth Friendly Products, 11150 Hope Street, Cypress, CA 90630
1.800.335.ECOS | ecos.com | @ecoscleans

7  49174 09889  4

42.    In addition, Earth Friendly makes numerous statements in its advertisements and social media that the Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."

43.    Finally, during the Class Period, Earth Friendly's website, www.ecos.com, contained the following statements that the Products are "non-toxic," "safer," and/or environmentally-friendly:

- "**Cleaning power found in nature**: You wouldn't know it by looking at it, but a simple coconut carries powerful cleaning properties – while also being a highly renewable resource. It's the kind of criteria we apply to all of our ingredients through cutting edge clean chemistry, so **you can be confident that every ECOS product is safer for you, and safer for the environment, too.**

- "**Invite Climate Positive Cleaning Into Your Home**: At ECOS, every footprint counts. From where we place our factories to how our formulas react with the environment, we pay careful attention to the entire life cycle of everything we make. It's how we've managed to become a **Climate Positive** company. Rest assured that when you use an ECOS product, you're making a positive contribution to our planet."

- "Formulated for Human Kindness **We've been at the forefront of clean, green chemistry for over 50 years. That means not only is every ingredient we use analyzed and tested for safety and sustainability; we're also constantly researching new ways to harness the cleaning power found in nature**. Rest assured that every ECOS product is scientifically proven to offer a thorough clean, while also protecting the things you care about most."

- "Can conscious cleaning help clean up the earth?  Absolutely. We've spent five decades perfecting clean manufacturing and sustainable business practices, so that what's good for you is positive for the planet, too. **We see every aspect of our business as an opportunity to make our planet a little greener – and there's no step too small along the way.**"

- "Journey to a Climate Positive Clean: We believe that saving the planet starts with small acts. That every action, big or small, has the power to lead to a more sustainable world. That's why we're intentional in every step of our business, from where a product is sourced, to how it's made, to where it ends up, because we don't just want to be neutral – **we're here to leave a positive impact on the planet we all call home.**"

- "**Sustainable chemistry** is circular chemistry.  Sustainable chemistry takes into account the entire lifecycle of a product or formula, from design and manufacturing to use and disposal. It's a holistic approach to product design **that seeks to maximize both human and environmental health**, and we've been pioneering the field for over 50 years. Our green chemists are constantly pushing the boundaries of sustainable chemistry because we believe in the power of science to improve human life and save the world."

- "If it touches your skin, it's likely in your body. Laundry detergent, hand soap, dish soap…If it's on your skin, it's likely to enter your body. Our hypoallergenic formulas are dermatologist tested and **use only the safest ingredients**. That means our detergents and cleaners won't harm you if left on your skin."

- "**No Nasties, no exceptions. Clean shouldn't mean spreading toxins all over your home**."

- "**Let nature do the hard work**. Our living ecosystem is miraculously full of regenerative processes and cycles. From photosynthesis to the carbon cycle,

  - **natural already knows how to clean. We harness this power using plant-derived ingredients as our active cleaners**."

- "Lifecycle: infinity. **We rigorously study the environmental impact of each ingredient and product through a detailed lifecycle analysis**. All our formulas are readily biodegradable, and we never use ingredients that bioaccumulate. Our plant-powered cleaners are made from renewable resources."

- "Pencils never down, because science never stands still. **We believe it's our responsibility to push green chemistry forward, and our work is never done**. We research, prototype, test, iterate, optimize, then rinse & repeat. We are tinkerers, boundary-breakers and innovators. **Sustainable chemistry is constantly evolving, and we're at the forefront of that progress**."

- "The Source for Clean Living: **This is your one-stop resource for clean living when it comes to your health, your home and your world**."

- "**We've built our team around an essential mission: to protect the health and wellness of people, pets and the planet by creating safer, sustainable cleaning products that everyone can afford**."

(Emphasis added).

44.     Earth Friendly couples its "non-toxic," "safer," and environmentally-friendly claims with third-party seals and icon-style designs to further portray the ECOS Products as

alternatives that provide environmental and other benefits that traditional household cleaning products do not.

45.     For example, the front labels of the ECOS Products currently include an icon indicating participation in the EPA's "Safer Choice" market-based incentive program.

46.     The EPA's Safer Choice program relies on hazard analysis, rather than risk analysis, to assess product safety.  While popular with many stakeholders and expedient from a resource-management perspective, hazard-based ingredient standards say little about the broader sustainability— or "environmental responsibility"—of the end-use product.[17]  Indeed, the by the EPA's own admission, the "Criteria for Safer Chemical Ingredients" allows products to include ingredients that have hazard profile issues and chemicals that are not associated with a low level of hazard concern for all human health and environmental endpoints.

47.     Based on these "non-toxic," "safer," and environmentally-friendly representations, reasonable consumers, including Plaintiff, believe that the Products do not pose any risk to humans, animals, and/or the environment.  This understanding is reinforced by the Products' manufacturer's company name, "Earth Friendly Products," and the Products' "ECOS" brand name, which further represent that they are "Green" products which are known to be environmentally- and eco-friendly.  However, in spite of the labeling and marketing representations, the Products do, in fact, pose a risk to humans, animals, and/or the environment. That is because they contain toxic, harmful, dangerous, and environmentally damaging ingredients which can cause harm to humans, animals and/or the environment.

---

[17] *See, e.g.*, Charles L. Franklin, "Chasing Hazards: Toxicity, Sustainability, and the Hazard Paradox," *Natural Resource & Environment* (ABA), Vol. 29, at 4 (Spring 2015).

48.     Representing that a product is "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" is a statement of fact.

49.     Consumers reasonably believe that a product labeled as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" does not contain ingredients that can cause harm to humans, animals and/or the environment.

**The Products Are Not "Non-Toxic," Safe, or Environmentally Friendly**

50.     Earth Friendly's representations that its ECOS Products are non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" are false, misleading, and deceptive because they contain ingredients, which, at their given concentrations in the Products, can cause harm to humans, animals, and/or the environment.  The ECOS Products contain multiple toxic, harmful, dangerous, and environmentally damaging ingredients.

51.     Earth Friendly's ECOS Products contain the following non-exhaustive list of toxic, harmful, dangerous, and environmentally damaging ingredients:

a.  **Acetic Acid** is a substance that, on short exposure, could cause serious temporary or residual injury even if prompt medical treatment is given.  It is classified by multiple federal laws as a hazardous and toxic substance.  The National Institute for Occupational Safety and Health (NIOSH) determined that concentrations as low as 50 parts per million is immediately dangerous to life or health, meaning it poses an immediate threat to life, would cause irreversible adverse health effects, or would impair an individual's ability to escape from a dangerous atmosphere.  Animal testing indicates that it may affect genetic

20

material and cause reproductive effects.  It is a single exposure Category 1 systemic toxin, causing damage to the blood system after a single exposure.  It is also presumed to damage the respiratory organs after a single exposure.  Repeated or prolonged contact with spray mist may produce chronic eye irritation, severe skin irritation, and/or respiratory tract irritation leading to frequent attacks of bronchial infection and other respiratory effects, erosion of tooth enamel, and cracking and darkening of the exposed skin.  Accidental eye contact has caused irreversible corneal paralysis and muddiness.  It is highly corrosive to the skin and causes second degree burns after contact for a few minutes.  A harmful contamination of the air can be reached rather quickly on evaporation of this substance at below room temperature (20°C/68°F).  It is also harmful to plants, animals, and aquatic life.

b. **Alcohol Dent.** is a mixture of ethanol (ethyl alcohol) with a denaturing agent.  It is considered broadly toxic and linked to birth defects following excessive oral ingestion.

c. **Benzyl Salicylate** is considered to be a substance that causes serious eye irritation, is harmful to aquatic life with long lasting effects and may cause an allergic skin reaction by the European Chemicals Agency.  It is classified as a frequent and well recognized allergen in Cosing, the European Commission database for information on cosmetic substances and ingredients.  The United States Environmental Protection Agency (EPA) lists benzyl salicylate as a suspected endocrine disruptor.

d. **Caprylyl/Myristyl Glucoside** can cause serious eye damage/eye irritation and is hazardous to the aquatic environment.

e. **Citral** is a naturally occurring scent ingredient; manufactured synthetically on a large scale; associated with allergies and contact dermatitis.

21

f.  **Coco Betaine** is a surfactant.  It has been association with irritation and allergic contact dermatitis and is suspected to be an environmental toxin.

g.  **Cocamidopropyl Betaine ("CAPB")** is a zwitterion used primarily as an amphoteric surfactant in laundry detergents, hand-dishwashing liquids, and hard surface cleaners. CAPB can cause eye and skin irritation that remains irreversible 21 days after exposure. In fact, in 2004, CAPB was named "Allergen of the Year" by the American Contact Dermatitis Society.  CAPB is contained in the Products and, on information and belief, at its given concentration in the Product, the CAPB can cause harm to the skin and eyes when these surfaces are exposed to it.  And is very toxic to aquatic life.

h.  **Cocamidopropylamine Oxide** is hazardous to humans and very toxic to aquatic life with long-lasting effects.  It causes serious eye damage that remains irreversible 21 days after exposure.  It causes category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure.

i.  **Coumarin** is a chemical that has been linked to liver damage, impaired cognitive development and even cancer formation in both animal and human studies.

j.  **Dimethicone** is a substance that comes from silicone.  Scientists have found silicones in the blood of fish, birds, and mammals. Studies have found that silicones are toxic to ecosystems and that they bioaccumulate, meaning they build up in the environment without breaking down.

k.  **Ethoxylated Propoxylated** is very toxic to aquatic life with long lasting effects and causes serious eye damage.

l.  **Ethylhexylglycerin** is toxic to aquatic organisms, with long-term adverse effects.  It is also harmful to humans, with eye contact causing serious eye damage.

m.  **Fragrance** refers to the combination of chemicals in a Product that gives the Product its distinct scent.  Fragrances have an intrinsic ability to cause sensitization by skin contact.  And given human heterogeneity, the achievement of zero risk of induction of contact dermatitis from fragranced products is likely unattainable, regardless of the small amount of fragrance added to consumer products.  Indeed, a sizeable segment of the American population reports adverse reactions to fragranced products, with 30.5% reporting that scented products are irritating and 19% experiencing headaches, breathing difficulties, and other problems from fragranced products.  In addition, individuals with asthma and chemical sensitivity report adverse effects to scented products in higher proportions than the general public.  Therefore, certain consumers exposed to these fragrances will experience some combination of eye, nose, and/or throat irritation, respiratory difficulty, possibly bronchoconstriction or asthma-like reaction, and central nervous systems reactions (e.g., dizziness, incoordination, confusion, fatigue).

n.  **Geraniol** is a known human immune system toxicant.  It is also suspected to be an environmental toxin.

o.  **Hexyl Cinnamal** is classified as hazardous to the aquatic environment, labeled both as an acute hazard and a long-term, chronic, hazard.  It is very toxic to aquatic life with long-lasting effects.

p.  **Lauryl Glucoside** is classified as a skin irritant and as a category 1 skin sensitizer, meaning that repeated skin contact causes a skin allergy in a substantial number of persons.  In these sensitized individuals, very low future exposure can cause itching and a

23

skin rash. Furthermore, it causes serious eye damage that remains irreversible 21 days after exposure.

q. **Lauramine Oxide** is an aliphatic tertiary amine oxide that is used mostly in hair care products as a foam builder and stabilizer, viscosity enhancer, emollient, conditioner, emulsifier, antistatic agent, and wetting agent.  The National Oceanic and Atmospheric Administration's CAMEO Chemicals, a database of hazardous chemical datasheets, lists lauramine oxide (by its chemical name Dimethyldodecylamine-N-Oxide) as highly toxic and states runoff from dilution water may be corrosive and/or toxic and cause pollution.[18] The U.S. National Library of Medicine's Toxicology Data Network lists lauramine oxide as an "Artificial Pollution Source" and warns, "Ultimate disposal of the chemical must consider: the material's impact on air quality; potential migration in soil or water; effects on animal, aquatic, and plant life."[19]

r. **Lauryl/Myristyl Glucoside** is classified as a skin irritant and as a category 1 skin sensitizer, meaning that repeated skin contact causes a skin allergy in a substantial number of persons.  In these sensitized individuals, very low future exposure can cause itching and a skin rash.  Furthermore, it causes serious eye damage that remains irreversible 21 days after exposure.  And the European Union Ecolabel program data shows this substance has high acute toxicity to aquatic life.

s. **Lavandula Angustifolia (Lavender) Oil** causes skin irritation and serious eye irritation. It is also harmful and toxic to aquatic life with long lasting effects.

---

[18] National Oceanic & Atmospheric Admin., Chemical Data Sheet, CAMEO Chemicals, available at: https://cameochemicals.noaa.gov/chemical/20239 (last visited Jul. 14, 2022).
[19] National Institutes of Health, U.S. National Library of Medicine. Hazardous Substances Data Bank, Toxicology Data Network: Lauramine Oxide, available at https://pubchem.ncbi.nlm.nih.gov/compound/Lauramine-oxide#section=Accidental-Release-Measures (last visited Jul. 14, 2022).

t.  **Limonene** is a possible human immune system toxicant or allergen.  It is classified by the European Union as a skin, eye, and lung irritant.

u.  **Linalool** is a known skin and eye irritant that can cause serious eye damage.[20]  Linalool is also highly harmful to aquatic life.[21]

v.  **Melaleuca Alternifolia (Tea Tree) Leaf Oil** is harmful if ingested.  It can cause skin irritation.  Animal and in vitro tests at low doses report reproductive and developmental toxicity.

w.  **Methylisothiazolinone** (2-methyl-4-isothiazolin-3-one, or "MI") is a powerful biocide used for controlling microbial growth in water-containing solutions.  MI is produced, generally, by the controlled chlorination of dimethyldithiodipropionamide ("DPAM") in solvent, followed by neutralization and extraction into water.  MI is an inexpensive and widely available synthetic biocidal preservative used for curbing microbial growth in water-containing solutions.  As far back as the mid-1980s, MI was recognized as a contact allergen.[22]  Approximately 10 years ago, MI's use in the United States moved from almost exclusively industrial applications to household and cosmetic applications.  Since then, MI's use has increased steadily in household and cosmetic applications.  It is highly toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.  The EPA lists MI as a pesticide and

---

[20] https://pubchem.ncbi.nlm.nih.gov/source/hsdb/645#section=GHS-Classification (last visited Jul. 14, 2022).
[21] *Id.*
[22] *See, e.g.*, DeGroot, A.C., and Weyland, J.W., "Kathon CG: A Review," 18 *Journal of the American Academy of Dermatology* 350 (1988).

describes it as "moderately to highly toxic to freshwater and estuarine/marine organisms."[23]

MI is also very toxic to aquatic life with long-lasting effects. It is classified as a category 1 skin sensitizer, meaning that repeated skin contact causes an allergic response in a substantial number of persons.  In these sensitized individuals, very low future exposure can cause itching and a skin rash.  It was named the Contact Allergen of the Year for 2013 by the American Contact Dermatitis Society.  In fact, the scientific literature is replete in case studies of people developing eczematous eruptions or dermatitis following use of common personal care products containing even minuscule amounts of methylisothiazolinone (as low as, or lower than, 20 parts per million, or 0.002%).  The European Union's Scientific Committee on Consumer Safety ("SCCS") concluded that, as to its potential to elicit contact allergy, no information was available to evaluate its safety in rinse-off products, and no safe concentration has been adequately demonstrated for in leave-on cosmetic products (including "wet wipes").  Methylisothiazolinone also causes category 1 eye damage (serious eye damage that remains irreversible 21 days after exposure), and category 1A skin corrosion, *i.e.*, it irreversibly damages the skin after short exposure.  In animal tests, the substance caused visible necrosis after less than 3 minutes of exposure.

x.  **PEG-12 Dimethicone**, according to a study published in the International Journal of Toxicology, can contain harmful impurities, including: Ethylene Oxide, known to increase the incidences of uterine and breast cancers and of leukemia and brain cancer.  It

---

[23] U.S. Environmental Protection Agency, Reregistration Eligibility Decision (RED)— Methylisothiazolinone. EPA738-R-98-012 (1998), available at https://archive.epa.gov/pesticides/reregistration/web/pdf/3092.pdf (last visited Jul. 14, 2022).

is a substance that comes from silicone.  Scientists have found silicones in the blood of fish, birds, and mammals.  Studies have found that silicones are toxic to ecosystems and that they bioaccumulate, meaning they build up in the environment without breaking down.

y. **Phenoxyethanol** is toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.  The Food and Drug Administration ("FDA") has warned that phenoxyethanol is dangerous.  Even short exposure could cause serious temporary or residual injury.  It is toxic to the kidneys, the nervous system, and the liver.  It is extremely hazardous in case of eye contact and very hazardous in case of skin contact (defatting the skin and adversely affecting the central nervous system and peripheral nervous system, causing headaches, tremors, and central nervous system depression).  It is also very hazardous in case of ingestion or inhalation. It degrades into substances that are even more toxic. It is a Category 2 germ cell mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure.  Phenoxyethanol is an ethylene glycol ether, which is known to cause wasting of the testicles, reproductive changes, infertility, and changes to kidney function.  Phenoxyethanol is also a Category 2 carcinogen, meaning that it is suspected to induce cancer or increase its incidence.  Case studies indicate that repeated exposure to phenoxyethanol results in acute neurotoxic effects, as well as chronic solvent- induced brain syndrome, constant irritability, impaired memory, depression, alcohol intolerance, episodes of tachycardia and dyspnea, and problems with balance and rash.

z. **Potassium Cocoate** also named "coconut potassic soap." Documented and confirmed toxicity occurs in mammals foetuses (teratogenicity); there are also suspicions about genetic toxicity towards immunitary human cells (lymphocites).

aa. **Potassium Sorbate** is acutely toxic, based on animal testing. Its use in cosmetic products is restricted in Europe. It is also hazardous in case of skin contact, eye contact, ingestion, or inhalation. Animal testing indicates it to be a possible mutagen.

bb. **Propanediol**, also called propylene glycol, may cause adverse reproductive effects and birth defects, based on animal testing. It is very toxic to aquatic life and a skin irritant. It is classified as a category 1 skin sensitizer, meaning that repeated skin contact causes a skin allergy in a substantial number of persons. In these sensitized individuals, very low future exposure can cause itching and a skin rash.

cc. **Propylene Glycol** may cause adverse reproductive effects and birth defects, based on animal testing. It is very toxic to aquatic life and a skin irritant. It is classified as a category 1 skin sensitizer, meaning that repeated skin contact causes a skin allergy in a substantial number of persons. In these sensitized individuals, very low future exposure can cause itching and a skin rash.

dd. **Sodium Carbonate** plays a role as a water-soluble builder and co-builder in phosphate-containing and non-phosphate detergents. On information and belief, the percentage of sodium carbonate in the Products may cause skin irritation and, potentially, ocular irritation when those surfaces are exposed to the Products.

ee. **Sodium Coco-Sulfate** is toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses. While its toxic properties have not been thoroughly investigated, animal testing indicates that sodium

coco-sulfate is a skin irritant and a severe eye irritant (causing eye damage that remains irreversible 21 days after exposure).  It is closely related to sodium lauryl sulfate, a toxic compound consumers frequently try to avoid.

ff. **Sodium Formate** causes irritation to skin, eyes, and respiratory tract.

gg. **Sodium Hydroxide** is a highly caustic and very corrosive, manufactured substance used to neutralize acids and make sodium salts.  Other common names include caustic soda and lye.  At room temperature, sodium hydroxide is a white, crystalline, odorless solid that absorbs moisture from the air.  When dissolved in water or neutralized with acid it releases substantial heat, which may be sufficient to ignite combustible materials. Sodium hydroxide is used to manufacture soaps, rayon, paper, explosives, dyestuffs, and petroleum products.  It is also used in metal cleaning and processing, oxide coating, electroplating, and electrolytic extracting.  It is commonly present in commercial drain and oven cleaners.  Sodium hydroxide is designated as a hazardous substance under section 311(b)(2)(A) of the Federal Water Pollution Control Act and further regulated by the Clean Water Act Amendments of 1977 and 1978.[24]

hh. **Sodium Lauryl Sulfate ("SLS")** is a white- or cream-colored crystal, flake, or powder with a faint odor used in general as a detergent, dispersant, and surfactant.  SLS is toxic to aquatic organisms.  The International Programme on Chemical Safety advises that SLS should be kept out of the environment, stating: "Do NOT let this chemical enter the environment."[25]

---

[24] 40 C.F.R. § 116.4.
[25] The International Labour Org., International Chemical Safety Card for Sodium Lauryl Sulfate, available at http:// https://www.ilo.org/dyn/icsc/showcard.display?p_lang=en&p_card_id=0502&p_version=1 (last visited Jul. 14, 2022).

ii. **Sodiuim Metasilicate** is toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.  It causes serious eye damage that remains irreversible 21 days after exposure.  It is highly corrosive to the skin, causing irreversible damage after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure.  It is acutely toxic if ingested, even in minute amounts.  Human ingestion of 1 mL/kg causes changes in tubules (including acute renal failure and necrosis), hematuria, and nausea or vomiting.

jj. **Sodiuim Metasilicate Pentahydrate** is a toxic substance that causes severe burns and serious eye damage.  It is harmful if ingested.  It is a category 1B skin sensitizer, meaning it causes severe skin burns and eye damage.  And it may cause respiratory tract irritation.

kk. **Tetrasodium Iminodisuccinate** is considered hazardous under federal law.

ll. **Urea** is a toxic ingredient.  Urea exerts both direct and indirect toxic effects on several organs in the body.  A high urea level causes changes in the gut bacterial population (microbiome) such that A) there is increased production of bacterial toxins such as indoxyl sulfate and p-cresyl sulfate; and B) inflammation in the intestinal wall leads to break down of intercellular tight junctions.  The net result is that bacterial toxins move across into the bloodstream and induces systemic inflammation which is linked with progression of kidney failure and cardiovascular death.  Urea also directly promotes cell death and calcification in blood vessels.  Further, elevated urea levels impair the response of fat cells (adipocytes) to insulin.  This insulin resistance likely increases the risk for pre-diabetes in patients with chronic kidney disease.

The indirect toxicity of urea occurs through irreversible modification of the body's proteins by a process called carbamylation, due to exposure to cyanate (a breakdown

product of urea). Elevated levels of blood carbamylated proteins in dialysis patients predicts higher death risk.  Carbamylated proteins promote atherosclerosis of blood vessels, increase kidney injury through fibrosis (abnormal collagen deposition), and worsen anemia by impairing the function of erythropoietin hormone.

In summary, there is mounting evidence that suggests a negative impact of elevated urea on patient outcomes.  Consequently, urea *per se* probably participates in the pathogenesis of cardiovascular disease, loss of kidney function, insulin resistance, intestinal disease and anemia (Fig. 1), and has re-emerged as a true toxin and Dark Force in chronic kidney disease.

52.      No product labeled "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" should contain any of these ingredients.  And yet, the ECOS Products contain the following, non-exhaustive, list of toxic, harmful dangerous, and environmentally damaging ingredients, which, at their given concentrations in the Products, can cause harm to humans, animals and/or the environment:

| **Product** | **Toxic, Harmful, Dangerous, and Environmentally Damaging Ingredients** |
|---|---|
| ECOS® All-Purpose Cleaner - Parsley Plus® | Caprylyl/Myristyl Glucoside<br>Propanediol<br>Potassium Sorbate<br>Alcohol Denat |
| ECOS® All-Purpose Cleaner - Orange Plus® | Caprylyl/ Myristyl Glucoside<br>Potassium Sorbate (preservative)<br>Alcohol Denat.<br>Limonene |
| ECOS® Cream Cleanser - Lemon | Phenoxyethanol<br>Cocamidopropyl Betaine<br>Limonene |

| | Sodium Metasilicate Pentahydrate |
|---|---|
| ECOS® Fruit + Veggie Wash | Alcohol Denat.<br>Caprylyl/Myristyl Glucoside<br>Potassium Sorbate |
| ECOS® Furniture Polish + Cleaner - Orange | Limonene<br>Phenoxyethanol<br>Sodium Hydroxide |
| ECOS® Shower Cleaner - Tea Tree | Caprylyl/Myristyl Glucoside<br>Alcohol Denat.<br>Potassium Sorbate<br>Melaleuca Alternifolia (Tea Tree) Leaf Oil<br>Lavandula Angustifolia (Lavender) Oil |
| ECOS® Stain + Odor Remover - Lemon | Alcohol Denat.<br>Caprylyl/Myristyl Glucoside<br>Potassium Sorbate<br>Limonene |
| ECOS® Stainless Steel Cleaner + Polish | Phenoxyethanol (preservative),<br>Methylisothiazolinone (preservative). |
| ECOS® Toilet Cleaner - Cedar | Caprylyl/Myristyl Glucoside<br>Potassium Sorbate |
| ECOS® Window Cleaner - Vinegar | Alcohol Denat.<br>Caprylyl/Myristyl Glucoside<br>Acetic Acid |
| ECOS® Between Baths™ Grooming Spray - Peppermint | Propanediol<br>Cocamidopropylamine Oxide<br>Phenoxyethanol<br>Melaleuca Alternifolia (Tea Tree) Oil |
| ECOS® Kitty Litter Deodorizer | Alcohol Denat.<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Phenoxyethanol<br>Geraniol |
| ECOS® Hypoallergenic Laundry Detergent with Enzymes - Magnolia & Lily | Cocamidopropyl Betaine<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Phenoxyethanol<br>Sodium Formate<br>Fragrance<br>Sodium Hydroxide<br>Hexyl Cinnamal |
| ECOS® Liquidless Laundry Detergent Squares - Lavender Vanilla | Sodium Lauryl Sulfate<br>Caprylyl/Capryl Glucoside |

| | Cocamidopropyl Betaine<br>PEG-12 Dimethicone<br>Cocamidopropylamine Oxide<br>Propylene Glycol<br>Phenoxyethanol<br>Dimethicone<br>Linalool<br>Coumarin |
|---|---|
| ECOS® Liquidless Laundry Detergent Squares - Free & Clear | Sodium Lauryl Sulfate<br>Caprylyl/Capryl Glucoside<br>Cocamidopropyl Betaine<br>PEG-12 Dimethicone<br>Cocamidopropylamine Oxide<br>Propylene Glycol<br>Phenoxyethanol<br>Dimethicone |
| ECOS® Liquidless Laundry Detergent Squares - Magnolia & Lily | Sodium Lauryl Sulfate<br>Caprylyl/Capryl Glucoside<br>Cocamidopropyl Betaine<br>PEG-12 Dimethicone<br>Cocamidopropylamine Oxide<br>Propylene Glycol<br>Phenoxyethanol<br>Fragrance<br>Dimethicone<br>Benzyl Salicylate<br>Coumarin<br>Hexyl Cinnamal |
| ECOS® Hypoallergenic Laundry Detergent Pack - Free & Clear | Sodium Carbonate<br>Sodium Metasilicate<br>Tetrasodium Iminodisuccinate<br>Sodium Coco-Sulfate<br>Lauryl Glucoside |
| ECOS® Hypoallergenic Hand Soap - Free & Clear | Cocamidopropyl Betaine<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Phenoxyethanol |
| ECOS® Hypoallergenic Pet Shampoo - Peppermint | Sodium Coco-Sulfate<br>Cocamidopropyl Betaine<br>Phenoxyethanol<br>Potassium Cocoate<br>Cocamidopropylamine Oxide |

| | |
|---|---|
| ECOS® Hypoallergenic Pet Shampoo – Fragrance Free | Sodium Coco-Sulfate<br>Lauryl/Myristyl Glucoside<br>Cocamidopropyl Betaine<br>Phenoxyethanol<br>Potassium Cocoate<br>Cocamidopropylamine Oxide |
| ECOS® Pet Stain & Odor Remover | Caprylyl/Myristyl Glucoside<br>ethoxylated propoxylated<br>Phenoxyethanol<br>Alcohol Denat.<br>Fragrance<br>Limonene<br>Methylisothiazolinone |
| ECOS® Hypoallergenic Dish Soap - Lavender | Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Lauramine Oxide<br>Phenoxyethanol<br>Coco Betaine<br>Ethylhexylglycerin<br>Lavandula Angustifolia (Lavender) Oil |
| ECOS® Hypoallergenic Dish Soap - Bamboo Lemon | Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Lauramine Oxide<br>Phenoxyethanol<br>Coco Betaine<br>Ethylhexylglycerin<br>Citral<br>Limonene |
| ECOS® Hypoallergenic Dish Soap - Grapefruit | Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Lauramine Oxide<br>Phenoxyethanol<br>Coco-Betaine<br>Ethylhexylglycerin |
| ECOS® Hypoallergenic Dish Soap - Apricot | Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Lauramine Oxide<br>Phenoxyethanol<br>Coco Betaine<br>Ethylhexylglycerin<br>Limonene |
| ECOS® Hypoallergenic Dish Soap - Pear | Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide |

| | Lauramine Oxide |
| | Phenoxyethanol |
| | Coco Betaine |
| | Ethylhexylglycerin |
| | Propylene Glycol |
| ECOS® Hypoallergenic Dishmate Dish Soap – Free & Clear | Sodium Coco-Sulfate |
| | Cocamidopropylamine Oxide |
| | Lauramine Oxide |
| | Phenoxyethanol |
| | Coco Betaine |
| | Ethylhexylglycerin |
| ECOS® Hypoallergenic Dishmate Dish Soap – Grapefruit | Sodium Coco-Sulfate |
| | Cocamidopropylamine Oxide |
| | Lauramine Oxide |
| | Phenoxyethanol |
| | Coco-Betaine |
| | Ethylhexylglycerin |
| ECOS® Hypoallergenic Dishmate Dish Soap – Almond | Sodium Coco-Sulfate |
| | Cocamidopropylamine Oxide |
| | Lauramine Oxide |
| | Phenoxyethanol |
| | Coco Betaine |
| | Ethylhexylglycerin |
| ECOS® Wave® Dishwasher Gel - Free & Clear | Caprylyl/Myristyl Glucoside |
| | Potassium Sorbate |
| ECOS®  Wave® Dishwasher Packs - Free & Clear | Tetrasodium Iminodisuccinate |
| | Caprylyl/Myristyl Glucoside |
| | Cocamidopropylamine Oxide |
| ECOS® WaveJet® Rinse Aid | Urea |
| | Phenoxyethanol |
| | Limonene |
| | Methylisothiazolinone |
| ECOS® Hypoallergenic Hand Soap - Lavender | Cocamidopropyl Betaine |
| | Sodium Coco-Sulfate |
| | Cocamidopropylamine Oxide |
| | Phenoxyethanol |
| | Lavandula Angustifolia (Lavender) Oil |
| | Linalool |
| ECOS® Hypoallergenic Hand Soap - Lemongrass | Cocamidopropyl Betaine |
| | Sodium Coco-Sulfate |
| | Cocamidopropylamine Oxide |
| | Phenoxyethanol |
| | Citral |

| | |
|---|---|
| ECOS® Hypoallergenic Hand Soap – Orange Blossom | Cocamidopropyl Betaine<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Phenoxyethanol |
| ECOS® Hypoallergenic Laundry Detergent - Lavender | Cocamidopropyl Betaine<br>Sodium Coco Sulfate<br>Cocamidopropylamine Oxide<br>Phenoxyethanol<br>Lavandula Angustifolia (Lavender) Oil,<br>Methylisothiazolinone |
| ECOSNEXT™ Hypoallergenic Liquidless Laundry Detergent - Magnolia & Lily | Sodium Lauryl Sulfate<br>Caprylyl/Capryl Glucoside<br>Cocamidopropyl Betaine<br>PEG-12 Dimethicone<br>Cocamidopropylamine Oxide<br>Propylene Glycol<br>Phenoxyethanol<br>Fragrance<br>Dimethicone<br>Benzyl Salicylate<br>Coumarin<br>Hexyl Cinnamal |
| ECOSNEXT™ Hypoallergenic Liquidless Laundry Detergent – Lavender Vanilla | Sodium Lauryl Sulfate<br>Caprylyl/Capryl Glucoside<br>Cocamidopropyl Betaine<br>PEG-12 Dimethicone<br>Cocamidopropylamine Oxide<br>Propylene Glycol<br>Phenoxyethanol<br>Dimethicone<br>Linalool<br>Coumarin |
| ECOSNEXT™ Hypoallergenic Liquidless Laundry Detergent – Free & Clear | Sodium Lauryl Sulfate<br>Caprylyl/Capryl Glucoside<br>Cocamidopropyl Betaine<br>PEG-12 Dimethicone<br>Cocamidopropylamine Oxide<br>Propylene Glycol<br>Phenoxyethanol<br>Dimethicone |
| ECOS® Hypoallergenic Laundry Detergent with Enzymes - Free & Clear | Cocamidopropyl Betaine<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide |

| | |
|---|---|
| | Phenoxyethanol<br>Sodium Formate<br>Sodium Hydroxide |
| ECOS® Hypoallergenic Laundry Detergent with Enzymes - Lavender | Cocamidopropyl Betaine<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Phenoxyethanol<br>Sodium Formate<br>Sodium Hydroxide |
| ECOSBreeze® Odor Eliminator - Magnolia & Lily | Alcohol Denat.<br>Caprylyl/Myristyl Glucoside<br>Potassium Sorbate<br>Fragrance<br>Hexyl Cinnamal |
| ECOSBreeze® Odor Eliminator - Lemongrass | Alcohol Denat.<br>Caprylyl/Myristyl Glucoside<br>Potassium Sorbate |
| ECOSBreeze® Odor Eliminator – Lavender Vanilla | Alcohol Denat.<br>Caprylyl/Myristyl Glucoside<br>Potassium Sorbate<br>Linalool |
| ECOS® Hypoallergenic Dish Soap - Free & Clear | Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Lauramine Oxide<br>Phenoxyethanol<br>Coco Betaine<br>Ethylhexylglycerin |
| ECOS® Hypoallergenic Laundry Detergent - Magnolia & Lily | Cocamidopropyl Betaine<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Phenoxyethanol<br>Fragrance<br>Methylisothiazolinone |
| ECOS® Hypoallergenic Laundry Detergent - Lemongrass | Cocamidopropyl Betaine<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Phenoxyethanol<br>Citral<br>Methylisothiazolinone |
| ECOS® Hypoallergenic Baby Laundry Detergent - Free & Clear | Cocamidopropyl Betaine<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide |

|  | Phenoxyethanol<br>Methylisothiazolinone |
|---|---|
| ECOS® Hypoallergenic Baby Laundry Detergent - Lavender Chamomile | Cocamidopropyl Betaine<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Phenoxyethanol<br>Alcohol Denat.<br>Methylisothiazolinone<br>Lavandula Angustifolia (Lavender) Oil |
| ECOS® Baby Bottle & Dish Wash - Free & Clear | Cocamidopropyl Betaine<br>Sodium Coco-Sulfate<br>Cocamidopropylamine Oxide<br>Phenoxyethnaol<br>Methylisothiazolinone |
| ECOS®  Baby Stain & Odor Remover | Alcohol Denat.<br>Caprylyl/Myristyl Glucoside<br>Potassium Sorbate<br>Limonene |
| ECOS® Baby Toy & Table Cleaner - Free & Clear | Alcohol Denat.<br>Caprylyl/Myristyl Glucoside<br>Potassium Sorbate |

**Plaintiff and Reasonable Consumers Were Misled by the Products**

53.     Given the significant presence of these toxic, harmful, dangerous, and environmentally damaging ingredients in the Products, Earth Friendly's representations that they are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" are deceptive and misleading.

54.     By misleadingly and deceptively labeling and marketing the Products, as described herein, Earth Friendly sought to take advantage of consumers' desire for true non-toxic, safe, and environmentally-friendly cleaning products.  Earth Friendly has done so at the expense of unwitting consumers—many of whom seek to protect their household members and

pets—and Earth Friendly's lawfully acting competitors, over whom Earth Friendly maintains an unfair competitive advantage.

57. 55. The non-toxic, safe, and environmentally-friendly representations were and are material to reasonable consumers, including Plaintiffs, in making purchasing decisions.

56. Plaintiffs relied on Earth Friendly's misrepresentations, described herein, in making the decision to purchase the Products.

57. At the time Plaintiffs purchased the Products, Plaintiffs did not know, and had no reason to know, that the Products' labeling and advertising were false, misleading, deceptive, and unlawful as set forth herein.

58. Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is non-toxic, safe, and environmentally-friendly, especially at the point of sale. Consumers would not know the true nature of the ingredients merely by reading the ingredients label.

59. Discovering that the ingredients at their given concentrations in the Products are not "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" and actually can cause harm to humans, animals and/or the environment requires a scientific investigation and knowledge of chemistry beyond that of the average consumer.  That is why, even though all of the ingredients listed above are identified on the back of the Products' packaging in the ingredients listed, the reasonable consumer would not understand – nor are they expected to understand - that these ingredients are toxic, harmful, dangerous, and environmentally damaging.

60. Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of the Products in order to confirm or debunk Earth Friendly's

prominent claims, representations, and warranties that the Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."

61.     Earth Friendly materially misled and failed to adequately inform reasonable consumers, including Plaintiff, that the Products can cause harm to humans, animals, and/or the environment.  A reasonable consumer understands Earth Friendly's "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" claims to mean that the Products are "non-toxic," "safer," and environmentally-friendly, and do not contain ingredients that can cause harm to humans, animals and/or the environment.

62.     Earth Friendly's representations that the Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" induced consumers, including Plaintiffs and Class Members, to pay a premium to purchase the Products.  Plaintiffs and Class Members relied on Earth Friendly's false and misleading misrepresentations in purchasing the Products at some premium price above comparable alternatives that are not represented to be non-toxic, safe, and environmentally-friendly.  If not for Earth Friendly's misrepresentations, Plaintiffs and Class Members would not have been willing to purchase the Products at a premium price. Accordingly, they have suffered an injury as a result of Earth Friendly's misrepresentations.

63.     Earth Friendly knew that consumers will pay more for a product labeled "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable," and intended to deceive Plaintiffs and

40

putative class members by labeling the ECOS Products as purportedly non-toxic, safe, and environmentally-friendly products.

64.     Earth Friendly has profited enormously from its false and misleading representations that ECOS Products are "non-toxic," "safer," and environmentally-friendly.  The purpose of this action is to require Earth Friendly to undertake a corrective advertising campaign and to provide consumers with monetary relief for Earth Friendly's deceptive and misleading product claims.

65.     Plaintiffs would not have purchased the Products if they had known the truth. Accordingly, based on Earth Friendly's material misrepresentations and omissions, reasonable consumers, including Plaintiffs, purchased the Products to their detriment.

66.     It is possible, however, that Plaintiffs would purchase the Products in the future if they were properly labeled, and/or the Products complied with the labeling and advertising statements.  Specifically, Plaintiffs would like to purchase the Products again if the Products no longer posed a risk of harm to humans, animals, and/or the environment.

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs and Class Members hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

68.     Plaintiffs brings this case as a class action that may be properly maintained under Federal Rule of Civil Procedure 23 on behalf of themselves and all persons in the United States, who within the relevant statute of limitations periods, purchased the Products for personal, family, or household use ("Nationwide Class" or the "Class").

69.     Plaintiff Delia De Santiago Lizama brings this case as a class action that may be properly maintained under Federal Rule of Civil Procedure 23 on behalf of herself and seeks to

represent a subclass defined as all Missouri residents, who within the relevant statute of limitations periods, purchased the Products for personal, family, or household use ("Missouri Subclass").

70. Plaintiff Michelle Olsen brings this case as a class action that may be properly maintained under Federal Rule of Civil Procedure 23 on behalf of herself and seeks to represent a subclass defined as all California residents, who within the relevant statute of limitations periods, purchased the Products for personal, family, or household use ("California Subclass").

71. Excluded from the Classes:

   i.   Defendant, any entity in which a Defendant has a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, predecessors, successors, assigns, and employees;

   ii.   Counsel and members of the immediate family of counsel for Plaintiffs herein; and

   iii.   The judge and staff to whom this case was assigned, and any member of the judge's immediate family;

   iv.   Individuals asserting claims for personal injury; and

   v.   Persons or entities that purchase the Products for sole purposes of resale.

72. Plaintiffs reserve the right to revise the class definitions with greater specificity or division after having an opportunity to conduct discovery.

73. The proposed Classes meet all requirements for class certification. The members of the Classes satisfy the numerosity standards. Plaintiffs have a good faith belief that there are tens of thousands of Class Members. Defendant has sold millions of units of the Products. As a

result, joinder of all Class Members in a single action is impracticable.  Class Members may be informed of the pendency of this Class Action by published and broadcast notice.

74.     Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, purchased, in a typical consumer setting, the ECOS Products in connection with Defendant's false, misleading, and deceptive statements.  Plaintiffs and Class Members have all sustained damages in that each paid the purchase price for the Products and sustained damages from Defendant's wrongful conduct.

75.     Plaintiffs will fairly and adequately protect the interests of the Class and the Subclasses and are adequate representatives of the Class and Subclasses because they are a member of the Class and respective Subclasses.  Plaintiffs have no interests which conflict with the interests of the members of the Class and Subclasses they seek to represent.  The interests of members of the Class and Subclasses will be fairly and adequately protected by Plaintiffs and their undersigned counsel, who have extensive experience prosecuting complex class action litigation.

76.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and/or fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.  The questions of law and fact common to the Class arising from Defendant's actions include, without limitation, the following:

> a.   Whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;
>
> b.   Whether Defendant's conduct was unfair and/or deceptive;

    c.    Whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon them by Plaintiff and the classes;

    d.    Whether Defendant breached warranties to Plaintiffs, the Class, and the Subclasses;

    e.    Whether Plaintiffs and the Classes have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages; and

    f.    Whether injunctive, declaratory, and/or other equitable relief is warranted.

77.    With respect to the Missouri Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendant violated the Missouri Merchandising and Practices Act.

78.    With respect to the California Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendant violated the California Consumer Legal Remedies Act, as well as California's False Advertising law and Unfair Competition law.

79.    These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual members of the Class and Subclasses. The resolution of common questions in this case will resolve the claims of both Plaintiff and the Classes.

80.    A class action is superior, with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by members of the Class and the

Subclasses would impose heavy burdens upon the courts and Defendant, and would create a risk of inconsistent or varying adjudications of the questions of law and/or fact common to the Class and the Subclasses.  In addition, the prosecution of separate actions by members of the Class and the Subclasses would establish incompatible standards of conduct for any party opposing the Class and the Subclasses.  Also, the prosecution of separate actions by individual members of the Class and the Subclasses, if fully adjudicated, as a practical matter, would be dispositive of the interests of the other members of the Class and the Subclasses not parties to that particular adjudication and, as such, would substantially impair or impede upon those members of the Class and the Subclasses' abilities to protect their interests.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

81.     The interest of members of the Class and the Subclasses in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class and Subclasses have a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for members of the Class and the Subclasses, while substantial in the aggregate, may not be great enough individually to enable them to maintain separate suits against Defendant.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

**COUNT I**
**Violation of Missouri's Merchandising Practices Act ("MMPA")**
**Deception, 15 CSR 60-9.020**
**(As to the Missouri Subclass Only)**

82.     Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

83.     Plaintiff Lizama brings this Count individually and on behalf of the members of the Missouri Subclass.

84.     The acts and practices engaged in by Defendant, and described herein, constitute unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §§ 407.010, *et seq*.

85.     Defendant's actions alleged herein violated, and continue to violate, the MMPA.

86.     Defendant is a "person" within the meaning of the MMPA, at Missouri Revised Statutes § 407.010(5).

87.     The goods purchased from Defendant are "merchandise" within the meaning of the MMPA, Missouri Revised Statutes § 407.010(4).

88.     The transactions resulting in purchases of goods from Defendant in Missouri are a "sale" within the meaning of the MMPA, Missouri Revised Statutes § 407.010(6).

89.     Defendant engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution or advertisement of the ECOS Products in violation of Mo. Rev. Stat. § 407.020, which states in relevant part as follows:

> 407.020. 1. The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... is declared to be an unlawful practice. ... Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

90.     Plaintiff Lizama and Missouri Subclass Members purchased the ECOS Products, products that were falsely and deceptively represented as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable," as stated above, in violation of the Missouri Merchandising

46

Practices Act and as a result Plaintiff Lizama suffered economic damages, in that the products

she and other Missouri Subclass Members purchased were worth less than the products they

thought they had purchased had Defendant's representations been true.

91.     Defendant's misrepresentations regarding the ECOS Products are material in that

they relate to matters that are important to consumers and/or are likely to affect the purchasing

decisions or conduct of consumers, including Plaintiff Lizama and members of the Missouri

Subclass.

92.     Plaintiff Lizama and Missouri Subclass Members purchased the ECOS Products

for personal, family, or household purposes.

93.     Plaintiff Lizama and Missouri Subclass Members reasonably and justifiably relied

on Defendant's misleading and fraudulent representations about the ECOS Products when

purchasing them.

94.     At all times relevant herein, Plaintiff Lizama was unaware that the ECOS

Products were not non-toxic, safe, and environmentally friendly and that they can cause harm to

humans, animals and/or the environment.

95.     Defendants' marketing materials for the ECOS Products do not disclose that the

Products are not non-toxic, safe, and environmentally friendly.

96.     Defendant's website does not disclose that the Products are not non-toxic, safe,

and environmentally friendly.

97.     Defendant's labeling for the ECOS Products does not disclose that the Products

are not non-toxic, safe, and environmentally friendly.

98.     Defendant's packaging for the ECOS Products does not disclose that the Products

are not non-toxic, safe, and environmentally friendly.

99.     Defendant's representations that the ECOS Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable," was a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material misrepresentation.

100.    The foregoing acts and practices of Defendant constituted unfair and unlawful practices, and deceptive conduct, in violation of the Missouri Merchandising Practices Act.

101.    As a direct proximate result of the above-described practices, Plaintiff Lizama and the Missouri Subclass Members suffered ascertainable loss of money due to the purchasing of the ECOS Products.

102.    Plaintiff Lizama and Missouri Subclass Members have suffered an ascertainable loss caused by Defendant because they would not have purchased the ECOS Products or would have paid significantly less for the Products, had they known that Defendant's conduct was misleading and fraudulent.

103.    Appropriate injunctive relief is necessary to prevent Defendant's MMPA violations from continuing.  If Defendant's violations of the MMPA are not stopped by such injunctive relief, Plaintiff Lizama and the members of the Missouri Subclass will continue to suffer injury.

104.    Defendant's misrepresentations and omissions were material because they were likely to deceive reasonable consumers.

105.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Lizama and the Missouri Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including not received the benefit of their bargain in purchasing the Products.

106.    Plaintiff Lizama and other members of the Missouri Subclass lost money or property as a result of Defendant's violations because: (a) they would not have purchased the Products on the same terms if they knew that the Products were not non-toxic, safe, and environmentally friendly; (b) they paid a substantial price premium compared to other household cleaning products due to Defendant's misrepresentations and deceptions; and (c) the Products do not have the characteristics, uses, or benefits as promised.

107.    Plaintiff Lizama and the Missouri Subclass seek all monetary and non-monetary relief allowed by law, including treble damages, attorneys' fees and costs, and any additional relief this Court deems necessary or proper.

108.    WHEREFORE, Plaintiff Lizama and the Missouri Subclass pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

### COUNT II
### Violation of Missouri's Merchandising Practices Act ("MMPA")
### Misrepresentation, 15 CSR 60-9.070
### (As to the Missouri Subclass Only)

109.    Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

110.    Plaintiff Lizama brings this Count individually and on behalf of the members of the Missouri Subclass.

111.    "A misrepresentation is an assertion that is not in accord with the facts."  15 CSR 60-9.070.

112.    As described further herein, whether a product is non-toxic, safe, and/or environmentally friendly is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

113.    Defendant's representations that the Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable," – when the Products can cause harm to humans, animals and/or the environment. - is a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material misrepresentation.

114.    Defendant's representations that the Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" is a material misrepresentation.

115.    Defendant's misrepresentations were material because they were likely to deceive reasonable consumers.

116.    Plaintiff Lizama purchased the Products for personal, family, or household purposes.

117.    Plaintiff Lizama suffered an ascertainable loss as a result of Defendant's unlawful conduct because the actual value of the Products as purchased was less than the value of the Products as represented.  In addition, the Products are legally worthless.

118.    WHEREFORE, Plaintiff Lizama and the Missouri Subclass pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT III
**Violation of Missouri's Merchandising Practices Act ("MMPA")**
**Concealment or Omission of any Material Fact, 15 CSR 60-9.110**
**(As to the Missouri Subclass Only)**

119.    Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

120.    Plaintiff Lizama brings this Count individually and on behalf of the members of the Missouri Subclass.

121.    The MMPA prohibits as an unlawful practice the act, use or employment of the "concealment, suppression or omission of any material fact" in connection with the sale or advertisement of any merchandise in trade or commerce.  §407.020.1, RSMo.

122.    A "material fact" is defined as "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."  15 CSR 60-9.010(1)(C).

123.    "Concealment of a material fact" is defined as "any method, act, use or practice which operates to hide or keep material facts from consumers."  15 CSR 60-9.110(1).

124.    "Omission of a material fact" is defined as "any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her."  15 CSR 60-9.110(3).

125.    Defendant's actions as alleged herein constitute the concealment and omission of material facts.

126.    Among other things, Defendants concealed and omitted the material facts that the Products are not non-toxic, safe, and environmentally friendly.

127.    As described further herein, the representation that a product is "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

51

128.    Defendant's labeling, packaging, marketing, and advertising for the Products does not disclose that the Products can cause harm to humans, animals, and/or the environment.

129.    Defendant's labeling, packaging, marketing, and advertising for the Products does not disclose which, if any, ingredients are toxic, harmful, dangerous, and environmentally damaging.

130.    As described further herein, whether a product is non-toxic, safe, and/or environmentally friendly is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

131.    Defendant's failure to disclose the fact that the Products can cause harm to humans, animals, and/or the environment was a violation of the Missouri Merchandising Practice Act, and was a material omission.

132.    Plaintiff Lizama purchased the Products for personal, family, or household purposes.

133.    Plaintiff Lizama suffered an ascertainable loss as a result of Defendant's unlawful conduct because the actual value of the Products as purchased was less than the value of the Products as represented. In addition, the Products are legally worthless.

134.    WHEREFORE, Plaintiff Lizama and the Missouri Subclass pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

**COUNT IV**
**Violation of Missouri's Merchandising Practices Act ("MMPA")**
**Half-Truths, 15 CSR 60-9.090**
**(As to the Missouri Subclass Only)**

135.    Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

136.    Plaintiff Lizama brings this Count individually and on behalf of the members of the Missouri Subclass.

137.    A half-truth misrepresentation as defined in the MMPA occurs when "any person in connection with the advertisement or sale of merchandise to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they are made, not misleading."  15 CSR 60-9.090.

138.    A "material fact" is defined as "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."  15 CSR 60-9.010(1)(C).

139.    "Omission of a material fact" is defined as "any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her." 15 CSR 60-9.110(3).

140.    Defendant's actions as alleged herein constitute the concealment and omission of material facts.

141.    Among other things, Defendant concealed and omitted the material facts that the Products were not non-toxic, safe, and environmentally friendly.

142.    As described further herein, the representation that a product is "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

53

143.    Defendant's labeling, packaging, marketing, and advertising for the Products does not disclose that the Products can cause harm to humans, animals, and/or the environment.

144.    Defendant's labeling, packaging, marketing, and advertising for the Products does not disclose which, if any, ingredients are toxic, harmful, dangerous, and environmentally damaging.

145.    As described further herein, whether a product is non-toxic, safe, and/or environmentally friendly is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

146.    Defendant's failure to disclose the fact that the Products can cause harm to humans, animals, and/or the environment, was a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material omission.

147.    Defendant's failure to disclose the fact that the Products contain toxic, harmful, dangerous, and environmentally damaging ingredients was a violation of the Missouri Merchandising Practice Act, and was a material omission.

148.    Plaintiff Lizama purchased the Products for personal, family, or household purposes.

149.    Plaintiff Lizama suffered an ascertainable loss as a result of Defendant's unlawful conduct because the actual value of the Products as purchased was less than the value of the Products as represented.  In addition, the Products are legally worthless.

150.    WHEREFORE, Plaintiff Lizama and the Missouri Subclass pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

**COUNT V**
**Violation of Missouri's Merchandising Practices Act ("MMPA")**
**Unfair Practice, 15 CSR 60-8.020**
**(As to the Missouri Subclass Only)**

151.     Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each

and every allegation set forth in the preceding paragraphs of this Complaint.

152.     Plaintiff Lizama brings this Count individually and on behalf of the members of

the Missouri Subclass.

153.     An unlawful practice as defined in the MMPA is any practice which "offends any

public policy as it has been established by the Constitution, statutes or common law of this state,

*or by the Federal Trade Commission, or its interpretive decisions*."  15 CSR 60-8.020

(emphasis added).

154.     Additionally, Defendant's marketing, advertising, and labeling of the Products, as

alleged herein, violates the MMPA, § 407.010 *et. seq.*

155.     Defendant's actions as alleged herein constitute an unlawful practice under the

MMPA.

156.     Here, Defendant's labeling, marketing, and advertising of the Products, as alleged

herein, violates the Guides for the Use of Environmental Marketing Claims, promulgated at 16

C.F.R. Part 260 ("Green Guides"), among others as set forth in this Complaint.

157.     As alleged in detail throughout the complaint, Defendant's use of the "non-toxic,"

"safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors,"

"climate positive," "Earth Friendly," and/or "sustainable" label on the Products, and in the

marketing and advertising of the Products, despite the Products posing a risk of harm to humans,

animals, and/or the environment, violates, and is therefore not in compliance with, the Federal

55

Trade Commission's revised Guides for the Use of Environmental Marketing Claims, 16 C.F.R. Part 260 (Green Guides).

158.    Defendant's packaging, labeling, marketing, and advertising of the Products, as alleged herein, are false, deceptive, misleading, and unreasonable, and constitute unlawful conduct.

159.    Defendant knew or should have known of its unlawful conduct.

160.    There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.  Defendant should have complied with the law in its labeling, marketing, and advertising or otherwise manufactured and sold products that are truly non-toxic, safe, and environmentally friendly.

161.    All of the conduct alleged herein occurred and continues to occur in Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of ongoing conduct repeated on thousands of occasions daily.

162.    Plaintiff Lizama purchased the Products for personal, family, or household purposes.

163.    Plaintiff Lizama suffered an ascertainable loss as a result of Defendant's unlawful conduct because the actual value of the Products as purchased was less than the value of the Products as represented.  In addition, the Products are legally worthless.

164.    WHEREFORE, Plaintiff Lizama and the Missouri Subclass pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

**COUNT VI**
**Violation of California's Unfair and Deceptive Acts and Practices Law**
**Business and Professions Code § 17200,** *et seq.*
**(As to the California Subclass Only)**

165.    Plaintiffs hereby incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

166.    Plaintiff Olsen brings this Count pursuant to Business and Professions Code Section 17200, *et seq.*, on behalf of herself and the California Subclass.

167.    Defendant, in its advertising, packaging, and labeling of the Products, made false and misleading statements and fraudulent omissions regarding the quality and characteristics of the Products, specifically, marketing and labeling the Products "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable," when they can harm humans, animals, and/or the environment.  Such claims and omissions appear on the label and packaging of the Products, which are sold at retail stores, point-of-purchase displays, as well as Defendant's official website, and other retailers' advertisements that have adopted Defendant's advertisements.

168.    Defendant's labeling, marketing, and advertising of the Products led to, and continues to lead to, reasonable consumers, including Plaintiff Olsen, believing that the Products are non-toxic, safe, and environmentally-friendly.

169.    The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200.

170.    Defendant does not have any reasonable basis for the claims about the Products made in Defendant's marketing, advertising, and on Defendant's packaging or labeling because the Products can cause harm to humans, animals, and/or the environment.  Defendant knew and

57

knows that the Products are not "non-toxic," "safer," or environmentally-friendly though

Defendant intentionally advertised and marketed the Products to deceive reasonable consumers

into believing that Products were non-toxic, safe, and environmentally-friendly.

171.    In addition, Defendant's use of various forms of marketing and advertising media

to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as

represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading

advertising, and an unlawful business practice within the meaning of Business and Professions

Code §§ 17200 and 17531, which advertisements have deceived and are likely to deceive the

consuming public, in violation of Business and Professions Code § 17200.

172.    The misrepresentations by Defendant alleged herein constitute unfair, unlawful,

and fraudulent business practices within the meaning of California Business and Professions

Code § 17200, as set forth more fully below.

173.    Defendant failed to avail itself of reasonably available, lawful alternatives to

further its legitimate business interests.

174.    Plaintiff Olsen and the California Subclass would not have purchased the

Products but for the representations by Defendant about the Products as being "non-toxic,"

"safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors,"

"climate positive," "Earth Friendly," and/or "sustainable."

175.    Plaintiff Olsen and the California Subclass have suffered injury in fact and have

lost money or property as a result of and in reliance upon Defendant's false representations.

176.    All of the conduct alleged herein occurs and continues to occur in Defendant's

business.  Defendant's wrongful conduct is part of a pattern, practice and/or generalized course

of conduct, which will continue on a daily basis until Defendant voluntarily alters its conduct or it is otherwise ordered to do so.

177.     Pursuant to Business and Professions Code §§ 17203 and 17535, Plaintiff Olsen and the members of the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling, marketing, and advertising the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."  Likewise, Plaintiff Olsen and the California Subclass seek an order requiring Defendant to rectify such misrepresentations through truthful disclosures, and to preclude Defendant's from denying the existence and significance of said misrepresentations in response to inquiries regarding the Products.  Plaintiff Olsen and the California Subclass have no alternative adequate remedy at law.  Without equitable relief, Defendant's unlawful, fraudulent, and unfair practices will continue to harm Plaintiff Olsen and the California Subclass.  Plaintiff Olsen and the California Subclass also seek restitution of the amounts Defendant acquired through the unfair, unlawful, and fraudulent business practices described herein.

## A.  "Unfair" Prong

178.     Under California's Unfair Competition Law, codified at Cal. Bus. & Prof. Code §§ 17200, *et seq.*, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).  Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code § 17200.  They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank*

*Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).  Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition."  *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

179.    The injuries to Plaintiff Olsen and the California Subclass resulting from Defendant's unfair business practice outweigh any benefits.  Defendant's action of marketing, advertising, and labeling the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" when they can cause harm to humans, animals, and/or the environment, does not confer any benefit to consumers.  Defendant's action of marketing, advertising, and labeling the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" does not confer any benefit to consumers when the consumers do not receive products commensurate with consumers' reasonable expectations engendered by such false, misleading, and deceptive marketing and labeling.  Defendant's action of marketing, advertising, and labeling the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" when consumers end up overpaying for the Products and receiving Products of lesser standards than what they reasonably expected to receive.  Consumers cannot reasonably avoid the injuries caused by Defendant's deceptive labeling and advertising of the Products.  Accordingly, the injuries caused by Defendant's deceptive labeling, marketing, and advertising outweigh any benefits.

180.    The gravity of the harm to Plaintiff Olsen and the California Subclass resulting from Defendant's unfair business practice outweighs any utility.  Defendant's conduct of marketing, advertising, and labeling the Products as "non-toxic," "safer," "made without known

carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" when they can cause harm to humans, animals, and/or the environment, has no legitimate utility. The utility of Defendant's conduct is vastly outweighed by the gravity of harm.

181.    As alleged herein, the misrepresentations by Defendant constitute an unfair business practice within the meaning of California Business and Professions Code, § 17200.

182.    Defendant knew or should have known of its unfair conduct as alleged herein.

183.    There existed reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Defendant could have refrained from marketing, advertising, and labeling the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" or manufactured and sold products that are truly non-toxic, safe, and environmentally-friendly.

184.    All of the conduct alleged herein occurs and continues to occur in Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

185.    Pursuant to Business and Professions Code § 17203, Plaintiff Olsen and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of marketing, advertising, and labeling the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."  Plaintiff Olsen and the California Subclass have no adequate remedy at law.  Without equitable relief, Defendant's unlawful, fraudulent, and unfair practices will continue to harm Plaintiff Olsen and the California Subclass.

Plaintiff and the Class also seek restitution of the amount Defendant acquired through the unfair, unlawful, and fraudulent business practices described herein. 122. Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendant's unfair conduct. Plaintiff and the California Subclass paid an unwarranted premium for these Products. Specifically, Plaintiff Olsen and the California Subclass paid for Products that can harm humans, animals, and/or the environment. Plaintiff Olsen and the California Subclass would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' marketing, advertising, and labeling were deceptive.

### B.  "Fraudulent" Prong

186.    California Business and Professions Code, §§ 17200, *et seq.*, prohibits fraudulent conduct that is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1267 (1992).

187.    Defendant's labeling, marketing, and advertising of the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable," as alleged herein, is false, deceptive, misleading, and unreasonable, and, therefore, constitutes a fraudulent business practice in violation of California Business and Professions Code, § 17200.

188.    Defendant knew, or should have known, that the Products pose a risk of harm to humans, animals, and/or the environment.

189.    Labeling, marketing, and advertising Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" is likely to deceive members of the public into believing that they do not pose a risk of harm to humans, animals, and/or the environment.

190.    At all relevant times, Defendant had reasonably available alternatives to further its legitimate business interests.  Defendant could have refrained from labeling, marketing, and advertising the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" or manufactured and sold products that do not pose a risk of harm to humans, animals and/or the environment.

191.    All of the conduct alleged herein occurs and continues to occur in Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of ongoing conduct repeated on thousands of occasions daily.

192.    Pursuant to Business and Professions Code §17203, Plaintiff Olsen and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ their practice of marketing, advertising, and labeling the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."  Plaintiff Olsen and the California Subclass have no adequate remedy at law.  Without equitable relief, Defendant's unlawful, fraudulent, and unfair practices will continue to harm Plaintiff Olsen and the California Subclass. Plaintiff Olsen and the California Subclass also seek restitution of the amounts Defendant acquired through the unfair, unlawful, and fraudulent business practices described herein.

193.    Plaintiff Olsen and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's fraudulent conduct.  Plaintiff Olsen and the California Subclass have paid an unwarranted premium for the Products.  Specifically, Plaintiff Olsen and the California Subclass paid for products that they believed were non-toxic, safe, and environmentally friendly when, in fact, they can cause harm to humans, animals, and/or the

environment.  Plaintiff Olsen and the California Subclass would not have purchased the Products if they had known that they were not non-toxic, safe, and environmentally friendly.

### C.  "Unlawful" Prong

194.    California Business and Professions Code, § 17200, *et seq.*, identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable."  *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

195.    Here, Defendant's labeling of the Products, as alleged herein, violates the Guides for the Use of Environmental Marketing Claims, promulgated at 16 C.F.R. Part 260 ("Green Guides"); the False Advertising Law, codified at Cal. Bus. & Prof. Code §§ 17500, *et seq.*; and the Consumer Legal Remedies Act, codified at Cal. Civ. Code §§ 1750, *et seq.*, among others as set forth in this complaint.

196.    As alleged in detail throughout the complaint, Defendant's use of the "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable" label on the Products, and the marketing and advertising of the Products, despite the Products posing a risk of harm to humans, animals, and/or the environment, violates, and is therefore not in compliance with, the Federal Trade Commission's revised Guides for the Use of Environmental Marketing Claims, 16 C.F.R. Part 260 (Green Guides).

197.    Additionally, Defendant's advertising of the Products, as alleged herein, violates California Civil Code, §§ 1750, *et seq.* and California Business and Professions Code § 17500, *et seq.*

198.    Defendant's packaging, labeling, marketing, and advertising of the Products, as alleged herein, are false, deceptive, misleading, and unreasonable, and constitute unlawful conduct.

199.    Defendant knew or should have known of its unlawful conduct.

200.    As alleged herein, the misrepresentations by Defendant constitute an unlawful business practice within the meaning of California Business and Professions Code § 17200.

201.    Additionally, Defendant's misrepresentations constitute violations of California Business and Professions Code, § 17580.5, which provides that it is "unlawful for any person to make any untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied."

202.    There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.  Defendant should have complied with the law in its labeling, marketing, and advertising or otherwise manufactured and sold products that are truly non-toxic, safe, and environmentally friendly.

203.    All of the conduct alleged herein occurred and continues to occur in Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of ongoing conduct repeated on thousands of occasions daily.

204.    Pursuant to Business and Professions Code, § 17203, Plaintiff Olsen and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising of the Products.  Plaintiff Olsen and the California Subclass have no adequate remedy at law.  Without equitable relief, Defendant's unlawful, fraudulent, and unfair practices will continue to harm Plaintiff Olsen and the California Subclass.  Plaintiff Olsen and the California Subclass also seek restitution of the amounts

65

Defendant acquired through the unfair, unlawful, and fraudulent business practices described herein.

205.    Plaintiff Olsen and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's unlawful conduct.  Plaintiff Olsen and the California Subclass paid an unwarranted premium for the Products.  Plaintiff Olsen and the California Subclass would not have purchased the Products if they had known that Defendant purposely deceived consumers into believing that the Products are non-toxic, safe, and environmentally friendly cleaning products.

### COUNT VII
### Deceptive Advertising Practices
### Violation of California's Business and Professions Code § 17500, *et seq.*
### (As to the California Subclass Only)

206.    Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

207.    Plaintiff Michelle Olsen brings this Count pursuant to Business and Professions Code Section 17500, *et seq.*, on behalf of herself and the California Subclass.

208.    California Business & Professions Code § 17500 prohibits "unfair, deceptive, untrue or misleading advertising[.]"

209.    Defendant violated § 17500 when it represented, through its false and misleading advertising and other express representations, that Defendant's Products possessed characteristics and value that they did not actually have.

210.    Defendant's deceptive practices were specifically designed to induce reasonable consumers like Plaintiff Olsen and members of the California Subclass to purchase the Products. Defendant's uniform, material representations and omissions regarding the Products were likely to deceive the public into believing that the Products do not pose a risk of harm to humans,

66

animals, and/or the environment.  Defendant knew or should have known that its uniform representations and omissions were untrue and misleading.  Plaintiff Olsen and the California Subclass purchased the Products in reliance on the representations made by Defendant, as alleged herein.

211.    Plaintiff Olsen and members of the California Subclass have been directly and proximately injured by Defendant's conduct in ways including, but not limited to, the monies paid to Defendant for the Products that lacked the characteristics advertised, interest lost on those monies, and consumers' unwitting support of a business enterprise that promotes deception and undue greed to the detriment of consumers, such as Plaintiff Olsen and members of the California Subclass.

212.    The above acts of Defendant, in disseminating materially misleading and deceptive representations and statements throughout California and the nation to consumers, including Plaintiff Olsen and members of the California Subclass, were and are likely to deceive reasonable consumers in violation of § 17500.

213.    In making and disseminating the statements alleged herein, Defendant knew or should have known that the statements were untrue or misleading, and acted in violation of § 17500.

214.    Defendant continues to engage in unlawful, unfair and deceptive practices in violation of § 17500.

215.    As a direct and proximate result of Defendant's unlawful conduct in violation of § 17500, Plaintiff Olsen and members of the California Subclass, pursuant to § 17535, are entitled to an order of this Court enjoining such future wrongful conduct on the part of Defendant, and requiring Defendant to disclose the true nature of its misrepresentations.  Plaintiff Olsen and the

California Subclass have no adequate remedy at law.  Without equitable relief, Defendant's

unfair, deceptive, untrue, and misleading practices will continue to harm Plaintiff Olsen and the

California Subclass.  Plaintiff Olsen and members of the California Subclass are also entitled to

compensatory, monetary, restitutionary, and punitive damages in an amount to be determined at

trial.

**COUNT VIII**
**Consumers Legal Remedy Act**
**Violation of Cal. Civ. Code § 1750, et seq.**
**(As to the California Subclass Only)**

216.    Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each

and every allegation set forth in the preceding paragraphs of this Complaint.

217.    Plaintiff Olsen brings this Count pursuant to California's Consumer Legal

Remedies Act ("CLRA"), codified at Cal. Civ. Code § 1750, *et seq.*, on behalf of herself and the

California Subclass.

218.    The CLRA provides that "unfair methods of competition and unfair or deceptive

acts or practices undertaken by any person in a transaction intended to result or which results in

the sale or lease of goods or services to any consumer are unlawful."

219.    The Products are "goods," as defined by the CLRA in California Civil Code,

section 1761(a).

220.    Defendant is a "person," as defined by the CLRA in California Civil Code,

section 1761(c).

221.    Plaintiff Olsen and members of the California Subclass are "consumers," as

defined by the CLRA in California Civil Code, § 1761(d).

222.    Purchase of the Products by Plaintiff Olsen and members of the California

Subclass are "transactions," as defined by the CLRA in California Civil Code, § 1761(e).

68

223.    Defendant violated § 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have" in that the Products are falsely labeled and advertised as being non-toxic, safe, and environmentally friendly.  Defendant knew that consumers will often pay more for products with this attribute and have unfairly profited from their false and misleading claims.

224.    Similarly, Defendant violated § 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . if they are of another" by falsely and deceptively labeling and advertising the Products as being non-toxic, safe, and environmentally friendly.

225.    In addition, Defendant violated § 1770(a)(9) by advertising the Products "with intent not to sell them as advertised" in that the Products are falsely labeled and advertised as being non-toxic, safe, and environmentally friendly.

226.    Defendant's uniform and material misrepresentations and omissions regarding the Products were likely to deceive the public.  Defendant knew or should have known that its misrepresentations and omissions were untrue and misleading.

227.    Plaintiff Olsen and members of the California Subclass could not have reasonably avoided such injury.  Plaintiff Olsen and members of the California Subclass were unaware of the existence of the facts that Defendant suppressed and failed to disclose; and Plaintiff Olsen and members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

228.    Plaintiff Olsen and members of the California Subclass have been directly and proximately injured by Defendant's conduct.  Such injury includes, but is not limited to, the purchase price of the Products and/or the premium paid for the Products.

229.     Given that Defendant's conduct violated § 1770(a), Plaintiff Olsen and members of the California Subclass seek injunctive relief to put an end to Defendant's violations of the CLRA.  Plaintiff Olsen and the California Subclass have no adequate remedy at law.  Without equitable relief, Defendant's unfair and deceptive practices will continue to harm Plaintiff Olsen and the California Subclass.  Plaintiff Olsen and the California Subclass also seek restitution of the amounts Defendant acquired through the false advertising described herein.

230.     Moreover, Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers to increase the sale of the Products.

231.     More than thirty days prior to the commencement of this action, on or about May 18, 2022, Plaintiff Olsen, on Plaintiff Olsen's own behalf and on behalf of members of the California Subclass, notified Defendant of the alleged violations of the Consumers Legal Remedies Act and demanded Defendant immediately rectify them pursuant to California Civil Code, § 1782(a).  Plaintiff Olsen delivered this notice and demand, via letters sent certified mail return receipt requested.  The letters were received by Defendants on May 23, 2022.  Defendant has not taken corrective action.

232.     Plaintiff Olsen and the California Subclass seek an order from this Court enjoining Defendant from continuing to employ the false and deceptive advertising, as alleged herein, pursuant to § 1780(a)(2).  Plaintiff Olsen and the California Subclass also seek compensatory, monetary, restitutionary, and punitive damages in an amount to be determined at trial.

**Count IX**
**Breach of Express Warranty**
**(As to the National Class, the Missouri Subclass, and the California Subclass)**

233.     Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

234.     Plaintiffs brings this Count individually and on behalf of the members of the proposed Classes against the Defendant.

235.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted and represented the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."  Defendant provided the Plaintiffs and Class Members with an express warranty in the form of written affirmations of fact promising and representing the Products as "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."  The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

236.     Defendant's express warranties, and its affirmations of fact and promises made to Plaintiffs and Class Members regarding the Products, became part of the basis of the bargain between Defendant and Plaintiffs and the Classes, thereby creating an express warranty that the Products would conform to those affirmations of fact, representations, promises, and descriptions.

237.     The Products do not conform to the express warranty because they are not non-toxic, safe, or environmentally friendly and can cause harm to humans, animals, and/or the environment.

238.    Defendant was provided notice of these issues by numerous public complaints and inquiries concerning its use of artificial preservatives in its products.

239.    Additionally, prior to the filing of this Complaint, Plaintiff Lizama timely notified Defendant of these breaches by letters via certified mail return receipt requested on January 26, 2022.  Plaintiff Lizama's letters were received by Defendant on January 31, 2022.  And Plaintiff Olsen notified Defendant of these breaches by letters via certified mail return receipt requested on May 18, 2022.  Plaintiff Olsen's letters were received by Defendant on May 23, 2022.

240.    Defendant has had a reasonable opportunity to cure its breach of written warranties and any additional opportunity to cure would be unnecessary and futile.

241.    As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and members of the Classes have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew the truth about the Products' toxic, harmful, dangerous, and environmentally damaging ingredients; (b) they paid a substantial price premium based on Defendants' express warranties; and (c) the Products do not have the characteristics, uses, or benefits as promised.

**COUNT X**
**Breach of Implied Warranty of Merchantability**
**(As to the National Class, the Missouri Subclass, and the California Subclass)**

242.    Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

243.    Plaintiffs brings this Count individually and on behalf of the members of the proposed Classes against the Defendant.

244.    Defendant is a merchant with respect to the sale of foods including the ECOS Products.  Defendant is the designer, manufacturer, marketer, distributor, and/or seller of the

72

Products.  Therefore, a warranty of merchantability is implied in every contract for sale of the Products to Plaintiffs and other consumers.

245.    In representing on the Products that the Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable," Defendant has provided a promise or affirmation of fact to Plaintiffs and other consumers.

246.    However, the Products do not conform to the promises or affirmations of fact, as the Products are not non-toxic, safe, and environmentally friendly.

247.    Therefore, Defendant has breached its implied warranty of merchantability in regard to the Products.

248.    If the Plaintiffs and members of the Classes had known that the Products do not conform to Defendants' promises or affirmations of fact, they would not have purchased the Product or would not have been willing to pay the premium price associated with Product. Therefore, as a direct and/or indirect result of Defendants' breach, Plaintiffs and members of the Classes have suffered injury and deserve to recover all damages afforded under the law.

**COUNT XI**
**Unjust Enrichment**
**(As to the National Class, the Missouri Subclass, and the California Subclass)**

249.    Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

250.    Plaintiffs bring this Count individually and on behalf of the members of the proposed Classes against the Defendant.

251.    At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiffs and the Classes.

252.     Plaintiffs and members of the Classes conferred upon Defendant nongratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing.  Defendant accepted or retained the nongratuitous benefits conferred by Plaintiffs and members of the Classes, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiffs and members of the Classes were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

253.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class Members' purchases of the Products.  Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiffs and Class Members because they would not have purchased the Products if the true facts had been known.

254.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiffs and members of the Classes for their unjust enrichment, as ordered by the Court.

**COUNT XII**
**Negligent Misrepresentation**
**(As to the National Class, the Missouri Subclass, and the California Subclass)**

255.     Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

256.     Plaintiffs bring this Count individually and on behalf of the members of the proposed Classes against the Defendant.

257.     Defendant has marketed the ECOS Products in a manner indicating that the Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or

74

endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."  However, the Products are not non-toxic, safe, and environmentally friendly because they can cause harm to humans, animals, and/or the environment.  Therefore, Defendant has made misrepresentations as to the Products.

258.    Defendant's representations regarding the Products are material to a reasonable consumer because they relate to the composition of the Products purchased by consumers.  A reasonable consumer would attach importance to such representations and would be induced to act thereon in making purchase decisions.

259.    At all relevant times when such misrepresentations were made, Defendant knew or has been negligent in not knowing that the representations were false and misleading. Defendant had no reasonable grounds for believing its representations were not false and misleading.

260.    Defendant intends that Plaintiffs and other consumers rely on the representations made about the Products, as the representations are made prominently on the Products, and are reinforced throughout Defendant's marketing and advertising campaigns.

261.    Plaintiffs and members of the Classes have reasonably and justifiably relied on Defendant's negligent misrepresentation when purchasing the Products, and had the correct facts been known, would not have purchased the Products or would not have purchased it at the prices at which they were offered.

262.    Therefore, as a direct and proximate result of Defendant's negligent misrepresentations, Plaintiffs and members of the Classes have suffered economic losses and other general and specific damages, including but not limited to the amounts paid for the

Products, premiums paid for the Products, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## COUNT XIII
### Fraud
**(As to the National Class, the Missouri Subclass, and the California Subclass)**

263.    Plaintiffs hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.    Plaintiffs brings this Count individually and on behalf of the members of the proposed Classes against the Defendant.

265.    As discussed above, Defendant has willfully, falsely, and knowingly provided Plaintiffs and Class members with false or misleading material information about the Products and failed to disclose material facts about the Products, including but not limited to the fact that the Products are not non-toxic, safe, and/or environmentally friendly.  Despite this, Defendant continues to intentionally represent that the Products are "non-toxic," "safer," "made without known carcinogens, reproductive toxins, or endocrine disruptors," "climate positive," "Earth Friendly," and/or "sustainable."  Therefore, Defendant has made, and continues to make, misrepresentations as to the Products.

266.    The misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase the Products.

267.    Defendants' misrepresentations are material (*i.e.*, the type of misrepresentations to which a reasonable person would attach importance and would be induced to act thereon in making purchase decisions), because they relate to the composition of the Products.

268.     Defendant knew or recklessly disregarded the fact that the Products they can cause harm to humans, animals, and/or the environment.

269.     Defendant intends that consumers rely on these representations, as the representations are made prominently on the Product, and are reinforced throughout Defendant's marketing and advertising campaigns.

270.     Plaintiffs and members of the Classes have reasonably and justifiably relied on Defendant's misrepresentations when purchasing the Products and had the correct facts been known, would not have purchased the Products or would not have purchased it at the prices at which they was offered.

271.     Therefore, as a direct and proximate result of Defendant's fraudulent actions, Plaintiffs and members of the Classes have suffered economic losses and other general and specific damages, including but not limited to the amounts paid for the Products, premiums paid for the Products, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

272.     WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.     For an order certifying the nationwide Class, the Missouri Subclass, and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiffs as National Class representatives; naming Plaintiff Lizama as Missouri Subclass representative; naming Plaintiff Olsen as California Subclass representative; and naming Plaintiff's attorneys as Class Counsel to represent the National Class, Missouri Subclass members, and California Subclass members;

b.      For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c.      For an order finding in favor of Plaintiffs, the Nationwide Class, the Missouri Subclass, and the California Subclass on all counts asserted herein;

d.      For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiffs and the Classes for all causes of action;

e.      For an order requiring Defendant to immediately cease and desist from selling its misbranded Products in violation of law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and order Defendant to engage in corrective action;

f.      For an order requiring Defendant to undertake a corrective advertising campaign;

g.      For prejudgment and postjudgment interest on all amounts awarded;

h.      For injunctive relief as pleaded or as the Court may deem proper;

i.      For an order awarding Plaintiffs and the Class and Missouri Subclass and California Subclass their reasonable attorneys' fees and expenses and costs of suit; and

j.      For such other and further relief as the Court deems just and proper.

## JURY DEMAND

273.      Plaintiff demands a trial by jury on all issues so triable.

Dated:   August 9, 2022

Respectfully submitted,

Orlowsky Law, LLC


/s/ Daniel J. Orlowsky
Daniel J. Orlowsky, #57387
7777 Bonhomme Ave., Suite 1910
St. Louis, Missouri 63105
Phone:  (314) 725-5151
Fax:  (314) 455-7375
dan@orlowskylaw.com

Attorney for Plaintiffs



Goffstein Law, LLC


/s/ Adam M. Goffstein
Adam M. Goffstein, #45611
7777 Bonhomme Ave., Suite 1910
St. Louis, Missouri 63105
Phone:  (314) 725-5151
Fax:  (314) 455-7278
adam@goffsteinlaw.com

Attorney for Plaintiffs